[No. C061006. Third Dist. Aug. 5, 2010.]

Conservatorship of the Person and Estate of CAROL K.
LYNN FRANK, as Public Guardian, etc., Petitioner and Respondent, v.
CAROL K., Objector and Appellant.

124

## Counsel

Paul Bernstein, under appointment by the Court of Appeal, for Objector and Appellant.

Robert A. Ryan, Jr., County Counsel, and Denis J. Zilaff, Deputy County Counsel, for Petitioner and Respondent.

## Opinion

**RAYE, Acting P. J.**—Once again, we confront a familiar and moral/legal dilemma that the Legislature has attempted to resolve: when should the state intervene to care for the nondangerous mentally ill? This dilemma pits our belief in individual liberties against our desire to protect the helpless, incapacitated individual in need of immediate assistance.

Here, a jury found defendant, 62-year-old Carol K., gravely disabled beyond a reasonable doubt. The court appointed the public guardian to act as Carol's conservator under the Lanterman-Petris-Short Act (LPS Act; Welf. & Inst. Code, § 5000 et seq.).[1] The court ordered Carol placed in a locked skilled nursing facility as the least restrictive placement. Carol appeals, challenging the sufficiency of the evidence to support a finding that she is gravely disabled and cannot obtain food, clothing, or shelter. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In November of 2007 the public guardian filed a petition for appointment of conservator of person and estate and for appointment of temporary conservator for Carol. The petition stated Carol was gravely disabled as a result of a mental disorder and was unwilling to accept treatment voluntarily. The petition also recommended placement in a locked facility based on Carol's failure to demonstrate a "real ability or willingness to remain in a placement in the community such as a [board and care]. Her admissions to

---

[1] All further statutory references are to the Welfare and Institutions Code.

this facility have increased recently due to [Carol's] delusional thought process and inability to maintain her placements."

In a declaration in support of the petition, staff psychiatrist Sonya Jackson stated Carol was unable to provide her basic personal needs for food, clothing, or shelter. According to Jackson, Carol "depends on a variety of institutions to provide her with her food. Recently, [Carol] has begun to state that the food that the residential facilities give her is poisoned and will leave her placement as a result of this. . . . [¶] . . . [¶] . . . [Carol] may lose her clothing between transitions from one facility to another and may need to rely on assistance in obtaining her clothes. [¶] . . . [¶] [Carol] has lost many of her placements due to accusing them of having criminals there. She also accuses these placements of poisoning and starving her. As a result of her delusional [thought process], [Carol] leaves these placements and comes to this facility and will frequently refuse to return, even if she is paid up through the month."

A jury trial followed. During jury selection Carol blurted out, "Stop it. Stop it." Shortly after, Carol sobbed audibly. While the jury was not present, Carol told defense counsel, "I can't get away from you," complained of breathing problems, accused counsel of knocking her off her chair, and called defense counsel an idiot. Following this outburst, the court told Carol, "Any type of action in the courtroom is going to be watched [¶] . . . [¶] . . . by all these other jurors. Can't really help you in any way. So I'd like you to try as best as you can to control your actions."

The following day, the court, out of the jury's presence, asked about the availability of the medications Carol was taking. The court also noted that the fire department and bailiffs had responded to the breathing incident in court the previous day. Although the court noted counsel stated Carol had a breathing or asthma problem, the court admonished Carol not to move her chair around or push away from the table or her counsel. With the approval of counsel, the court advised the jury that Carol had had an asthma attack.

*Testimony of Emily Wight*

Emily Wight, the deputy public guardian assigned to Carol's case, testified she investigates conservatorship referrals from psychiatric facilities. Wight evaluates referrals from psychiatrists stating that a person is gravely disabled. She independently evaluates the person to ascertain whether he or she is gravely disabled and proceeds with the referral if her findings comport with those of the referring psychiatrist.

Wight had investigated a prior temporary conservatorship for Carol the previous year. The temporary conservatorship did not proceed to a full conservatorship because Carol had done "very well."

As part of her investigations, Wight attempts to seek out relatives or other third parties to circumvent the need for conservatorships. However, Wight found no outside agency or third party willing to assist Carol.

Carol has been at a locked acute psychiatric hospital on at least 16 occasions. Carol needs a highly structured setting to control her mental illness. According to Wight, a locked acute psychiatric facility would provide the food, clothing, shelter, and medical assistance Carol needs.

Wight differentiated Carol's current state from her previous need for a temporary conservatorship. Currently, Carol is unwilling to work with agencies and third parties to take medication to keep her from being gravely disabled. Wight agreed with the psychiatrist's diagnosis that Carol is gravely disabled and needs a conservator.

Numerous less restrictive placements were unsuccessful. Carol was given multiple services to try to keep her stable in the community without a conservatorship. However, Carol refused to cooperate with those services. She would not allow the services agencies to take her to the doctor, and she would not cooperate by taking medication for her mental illness.

Carol's most recent placement at Willow Glen, a community placement, lasted only 33 days. At the facility, Carol either refused to take her medications or modified her medications. As a result, Carol lay on the floor for almost 24 hours, refusing to get up. She refused food and drink and urinated on herself several times, and would not allow staff to help her. During the incident, Carol kicked, hit, and spat on staff who were trying to help her. Ultimately, Carol was taken to an acute psychiatric hospital, her most recent hospitalization. The incident led to the request for a conservatorship.

On cross-examination, Wight stated Carol does not disagree she suffers from a mental illness, but Carol disagrees with the specific diagnosis. Carol believes she suffers from anxiety and depression. She refuses to take antipsychotic medications because she believes they make her psychotic.

*Testimony of Dr. Quanbeck*

Cameron Quanbeck, M.D., a board certified psychiatrist and University of California Davis Medical Center faculty member, testified he has diagnosed approximately 10,000 mentally ill individuals. The court found Dr. Quanbeck qualified as an expert in psychiatry.

Dr. Quanbeck treats Carol and has spoken with her weekly for the past five months. In conjunction with his assessment, Dr. Quanbeck spoke with Carol's

previous psychiatrist, reviewed her medical records, interviewed Carol and observed her behavior, contacted the nursing staff and other members of the treatment team, reviewed records of Carol's various placements, and spoke with Wight.

According to Dr. Quanbeck, Carol is one of the most complicated mentally disordered patients he has ever treated. He diagnosed Carol with bipolar disorder not otherwise specified and psychotic disorder not otherwise specified.[2] Carol's mental illness causes her to have breaks in reality and paranoid delusions that people are conspiring against her. Carol has a history of believing that other people have beaten her, raped her, tortured her, and pointed guns at her. She believes staff in psychiatric facilities have harmed her, coming into her room in the middle of the night to do these things. Dr. Quanbeck believed Carol would benefit from antipsychotic medication.

Dr. Quanbeck testified Carol also suffers from borderline personality disorder, causing rapid mood shifts and anxiety. The disorder causes Carol to make dramatic, false statements about her medical condition, claiming shortness of breath, chest pain, and paralysis. Carol's medical issues exacerbate her mental disorder, causing her to be very disabled and resulting in her multiple acute psychiatric hospitalizations.

At least 10 community placements failed because of Carol's mental illness and her claims that staff were poisoning, beating, and stabbing her. When a placement does not work out, Carol is placed in an acute psychiatric hospital for stabilization, a pattern repeated over and over.

On Carol's first day at Willow Glen, she said she was paralyzed, yelled at staff, and argued with her roommates. When staff members intervened to prevent a violent incident, Carol threatened staff members with her walker.

In a subsequent incident, Carol threw herself on the floor of a facility when staff was unable to take her shopping. Carol spat at, hit, and scratched a staff person, claiming she was having a heart attack. Dr. Quanbeck testified Carol's mental illness brought on the incident, and as a result she lost that placement.

Dr. Quanbeck also described a prior incident in which Carol became upset and refused food and fluids to the point that she became unresponsive. She was sent to the hospital, where staff found she was dehydrated and had to give her a number of bags of intravenous fluids. When she returned to her placement, she began to do it all over again. Dr. Quanbeck testified dehydration is a dangerous condition that can result in death.

---

[2] This diagnosis was consistent with the diagnosis of Carol's previous psychiatrist.

Carol believes she has suffered from chronic mental illness for the past 45 years. Carol fared better with a combination of lithium and Zyprexa, which allowed her to stay out of the hospital for three months in 2008. However, Carol now refuses to take Zyprexa and stopped taking antipsychotic medication while in the community placements. As a result, Carol stopped eating and drinking, resulting in hospitalization for intravenous administration of nutrition and fluids. Her refusal to eat or drink was potentially lethal and resulted from her failure to take medications to control her mental disorder.

Carol's mental illness renders her unable to cooperate with her treatment. Dr. Quanbeck discussed with Carol a plan she had to obtain food, clothing, and shelter. However, Dr. Quanbeck did not believe the plan was viable and noted it did not include the use of medication for her mental illness. The plan was not sufficient to keep Carol in the community.

Dr. Quanbeck testified Carol recognized some of her thoughts were delusional, but she could not stop acting on those delusions. He testified Carol would not take the antipsychotic medication because she believes it makes her psychotic. He also testified Carol is delusional about being allergic to antipsychotic medications, because she does not suffer allergic reactions when taking them.

In Dr. Quanbeck's opinion, Carol is gravely disabled, lacking the insight and ability to treat her mental illness on her own. While out in the community, Carol has refused to eat or drink, leading to hospitalization, signaling an inability to provide for food. In addition, Carol has had problems keeping herself clothed. On one occasion she walked around Willow Glen in only a bra; on other occasions she had pulled down her pants when angry. Carol cannot provide herself with shelter because of her paranoia that board and care personnel are harming her. This inability to maintain food, clothing, or shelter stems from her mental illness and refusal to take antipsychotic medication.

Carol has a long psychiatric history, with 13 admissions to the mental health treatment center over the 15 years prior to trial. Her most recent admission to an acute psychiatric hospital lasted two months. One day after her release she relapsed and was returned. She was again released to Willow Glen, but after one month she refused medication and was returned to the acute hospital. Carol had required acute hospitalization for almost the entire five months preceding the petition for conservatorship. During Carol's most recent admissions, she had multiple certification holds finding she was gravely disabled and unable to present a viable plan.

On cross-examination, Dr. Quanbeck admitted his opinion that Carol lacks insight is based on her disagreement over her diagnosis. Carol does have

insight into her other medical conditions, as well as depression and anxiety. Carol complies with her medication regimen for her physical conditions, except when she has episodes during which she refuses everything, including food and water.

Dr. Quanbeck also testified that when Carol claimed staff had beaten her, she had a "legitimate bruise" on her arm. He also stated staff sometimes use force when placing a patient in seclusion, noting Carol had been placed in seclusion as a "timeout."

*Carol's Courtroom Demeanor*

At the end of the first day of trial, Carol told court staff she could not safely take her papers back to the hospital because "[s]omebody will beat her to death if she's seen with them." The court asked why she was afraid, and Carol responded: "I've been beaten almost unconscious eight times in about three-and-a-half weeks and been given eight shots of Zyprexa by the 11:15 p.m. shift to the 7:15 a.m. shift. And they're the ones who have attacked me and beat me so badly I couldn't move. And they will kill me for these papers because they show that I'm the most honest person ever. And I'll show that she's the biggest liar. And these are all hospital reports and everything. And this proves that she's lying through her teeth about everything. And I will be beaten to death because I'm beaten already. I've been punched, stomped. Stomped here, here. Here, here."

Carol's psychiatrist questioned her about these statements. Carol stated her attorney told her he would not defend her. The court responded: "No, no, no, no. He didn't say that." Carol reiterated her belief that her attorney would not defend her, and the court responded, "I don't believe that's true."

*Carol's Testimony*

Carol was called as a witness by the public guardian. The court asked her to slow her testimony down and she replied: "I used to be a registered nurse and the doctors would want to take five minutes for each patient when you have 16." Carol proceeded to give a rambling account of her family history, education, and career aspirations. Carol claimed an experience or knowledge of 100 or 2,000 different fields.

After the court asked Carol if she knew why she was in court, she responded in a lengthy digression that ceased only when the court intervened. Carol stated she was fighting for her freedom, but also said the problem was "this woman [who] won't help me do anything and she's got complete control." She mentioned wanting to be a neat, clean person and wanting to

"go back to ranching and have all my beautiful animals." Then abruptly, Carol continued: "I can't let this woman control me like that. . . . [¶] . . . [¶] . . . And I don't know what to do except to—please, God, get this woman away from me. Make her stop making promises and not following through. I'm real tired of being abused physically and every other way, verbally and physically. I'm real tired of it."

Carol's testimony veered between describing her medical history and her travails in getting widow's benefits. She destroyed the application for benefits because she was afraid her caregiver would use it against her or commit fraud against her.

Carol stated she could not get benefits, could not work with a caregiver, and would not work with the conservator or rent a house because all those people were out to get her, would harm her, and would steal her identity or her money. She admitted having problems trying to find a place to live because everyone lied to her or would commit fraud against her.

According to Carol, she is currently in an acute psychiatric facility because she insulted a nurse while getting a catheter. This was her second admission. In the first she had a cardiac problem and was sent to the hospital. At the hospital, "I want to tell you what was in the bathroom was a water fountain. And what I did was have somebody get a soda for me. I gave them two dollars extra because I wanted to make sure I got the soda. And she came back and gave me the soda. And I took 14 pills." As a result, Carol was admitted to a psychiatric ward for attempted suicide, which Carol stated "was a good break from housework and everything."

Carol returned four times to the psychiatric hospital because she could not get heart medication in Elk Grove: "Because the women in Elk Grove wouldn't let me have my heart medication, wouldn't take me to the pharmacy, wouldn't let me buy food. . . . I couldn't make calls. Even to my doctor, anybody. I was stuck there on my own."

Carol testified she had no money, did not know who her doctor was, and did not want to take antipsychotic medication. During her testimony, Carol stated: "I'm confused. I'm going back and forth like a Ping-Pong ball." Carol stated she did not do well on antipsychotic medications and can only take "anxiety depressive medication" because that is what she was diagnosed with 45 years ago when she was 17. While she was on antipsychotic medication, Carol tried to kill herself 24 times, lost 60 pounds, and became anorexic. She also was evicted from her apartment of 24 years and spent all her money on clothes, shoes, and purses.

Carol liked her placement at Willow Glen. She left because it was too difficult to get into the dining room without her walker. Because she had

problems getting medications, she left the facility by ambulance. Carol denied she lay on the floor refusing to eat or drink.

Carol agreed she has a mental disorder consisting of anxiety and depression. When asked how she got the mental disorder, Carol stated she wanted to be a doctor, described her dating experience, and testified she had suffered from complete amnesia. Ultimately, she testified she had a nervous breakdown, which caused her mental illness.

Carol conceded she could use help in getting back on her own, but all she needed to find shelter was a phone and a newspaper. She had problems getting shelter in the past and made some "dumb" decisions. She did not have a plan for shelter if she were released from the conservatorship. Carol testified there were bullies in the community who always found her and took her walker, her belongings, her money, and everything she owned, making her feel vulnerable. Carol stated she had no plan for shelter if the jury found her competent. This was a dilemma because she has had "[n]othing but problems" finding places to live because everyone lies to her.

When asked about problems feeding herself, Carol replied, "I don't refuse food because I don't want to eat the food. I want to eat the food. But if it's the wrong food for me on my diet, which I requested, I can't eat it. I'll become ill." She has been fed food that makes her ill.

At the end of her testimony, Carol was sobbing. There was no examination by Carol's attorney.

After the jury found Carol gravely disabled, the court held a hearing on the appropriate placement for Carol and any specific restrictions to be imposed. Dr. Quanbeck recommended placement in a locked skilled nursing facility based on Carol's need for medical treatment and supervision. A lower level of care had not proved sufficient. Dr. Quanbeck believed Carol would not get better without antipsychotic medications, and a locked facility is the only type of facility where they can be administered involuntarily.

According to Dr. Quanbeck, Carol lacks the capacity to determine whether to take antipsychotics because of her paranoia about staff abusing and torturing her. Carol's refusal to take the medication has led her to make poor decisions regarding spending money, and Dr. Quanbeck advised she be barred from entering any contract for more than $55 per month. Dr. Quanbeck also recommended Carol be prohibited from operating a motor vehicle because of her medication and frequent attacks of chest pain. He also advised denying her the right to possess a firearm.

The court found Carol was not aware of her current situation. Although Carol was aware she suffered from anxiety and/or depression, she was not

aware she suffered from additional mental disorders "which are significantly hampering her ability to perform successfully out in the general community." The court also noted it had observed Carol in court and "I find, that while I believe [Carol] is quite intelligent, I do not believe that she is able to give informed consent because her current medical disorder has affected in certain instances her rational thought processes . . . ." The court found by clear and convincing evidence that it was appropriate for Carol to be subjected to involuntary medication.

The court appointed an LPS Act mental health conservator for Carol with the power to place her without her consent for psychiatric treatment. (§ 5350.) The court ordered Carol placed in a locked skilled nursing facility and prohibited her from possessing firearms, operating a motor vehicle, or entering contracts. The conservatorship expired one year from the order, on November 25, 2009. Carol filed a timely notice of appeal.

## DISCUSSION

### I.

As a threshold matter, the public guardian argues Carol's appeal is moot since the appointment of the public guardian terminated on November 25, 2009, by operation of law. According to the public guardian: "Even though this reviewing court has discretion to decide otherwise moot cases when the case presents important issues that are capable of repetition yet tend to evade review, this is not such a case. This case does not present important public policy decisions or present an important legal point that could evade review; instead it is a case specific to the facts that existed at one moment in time and which can never be repeated. Even a renewal petition, if filed, would be based on new facts as they exist at the time the petition is filed and not on the facts presented in this appeal."

█ We disagree. Even if a conservatorship terminates prior to appellate review, the appeal is not moot if it raises issues that are capable of repetition yet avoiding review. (*Conservatorship of Walker* (1987) 196 Cal.App.3d 1082, 1088, fn. 1 [242 Cal.Rptr. 289].) In addition, the continuing stigma of wrongful commitment, which continues even after the commitment has ceased, is grounds for entertaining an appeal. The issue is not moot, because " 'collateral consequences remain even after the conservatorship has been terminated.' [Citations.]" (*Conservatorship of Wilson* (1982) 137 Cal.App.3d 132, 136 [186 Cal.Rptr. 748].)

## II.

Carol may be placed under a conservatorship only if she is "gravely disabled" as a result of a mental disorder. (§ 5350.) In reviewing a conservatorship, we apply the substantial evidence standard to determine whether the record supports a finding of grave disability. The testimony of one witness may be sufficient to support such a finding. (*Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 697 [1 Cal.Rptr.2d 46].) We review the record as a whole in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence. Substantial evidence, which is evidence that is reasonable, credible, and of solid value, also includes circumstantial evidence. (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577 [254 Cal.Rptr. 552].)

## III.

Carol argues the jury's finding that she is gravely disabled is not supported by the evidence. Gravely disabled connotes a condition in which, as a result of a mental disorder, a person is unable to provide for his or her basic personal needs for food, clothing, or shelter. (§ 5008, subd. (h)(1)(A).)

In order to establish that a person is gravely disabled, the evidence must support an objective finding that the person, due to mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for his or her basic needs of food, clothing, or shelter. (*Conservatorship of Smith* (1986) 187 Cal.App.3d 903, 909 [232 Cal.Rptr. 277] (*Smith*).) The public guardian must prove the proposed conservatee is gravely disabled beyond a reasonable doubt. (*Ibid.*)

At the outset, Carol argues the evidence at trial focused "primarily on shelter," citing testimony by Dr. Quanbeck that he was not "relying on the food or clothing prongs of grave disability."[3] Carol's selective reading of Dr. Quanbeck's testimony is misleading. Dr. Quanbeck testified the main issue was shelter, but he also stated he had concerns about Carol's ability to eat and drink on her own out in the community. He based his concern on her prior episodes of refusing sustenance, which resulted in hospitalization. Dr. Quanbeck testified he was "concerned about [Carol] having another episode and not eating and . . . not drinking. Dehydration, it can be very dangerous."

Carol's gloss on the evidence also ignores the rest of Dr. Quanbeck's testimony, Wight's testimony, and Carol's own testimony, each of which

---

[3] Carol also asserts: "According to [Dr. Quanbeck], shelter was the only issue."

touched on the triad underlying grave disability: food, clothing, and shelter. In addition, grave disability can be based on an inability to provide for food, clothing, *or* shelter. It does not require a finding that a proposed conservatee cannot provide for her food, clothing, *and* shelter.

Dr. Quanbeck testified Carol had, on at least 10 occasions, lost community housing. Carol's paranoia about abuse by staff, coupled with her refusal to take antipsychotic medication, resulted in frequent failed placements. He also testified Carol had 13 admissions to the mental health treatment center in 15 years. Her last placement, to Willow Glen, lasted only a month.

Wight testified there were no outside agencies or third parties willing to assist Carol to keep her off conservatorship. According to Wight, Carol needed a highly structured setting to control her mental illness. Carol is not currently willing to work with agencies and third parties or to take medications to keep her from being gravely disabled.

Carol admitted needing aid in finding shelter for herself. She acknowledged she had problems finding shelter in the past, and had made bad decisions and some costly mistakes. During a lengthy digression, Carol stated she did not have a plan for shelter if she were released from the conservatorship.

Dr. Quanbeck also expressed concerns about Carol's ability to provide adequately for food. He noted that in the past Carol refused to eat and drink, resulting in hospitalization. Wight also testified regarding an incident in which Carol refused to eat or drink. Carol herself recounted the incident, and also testified she would not eat the food at some placements because it did not conform to her diet and would make her ill.

## IV.

Carol argues there was no evidence of a failure to provide herself food and clothing, and unstable housing does not, as a matter of law, constitute a lack of shelter. According to Carol, being homeless or being evicted does not establish a lack of shelter for purposes of LPS Act commitment. In support, Carol cites *Smith, supra*, 187 Cal.App.3d 903.

The *Smith* court found the evidence presented in the trial court insufficient to support a gravely disabled finding. Smith, the proposed conservatee, held an around-the-clock vigil outside a church. Her fixation on the church led her to sleep on the sidewalk in front of the church. Occasionally she became disruptive, and was arrested as many as 10 times. On two occasions she was admitted to a mental hospital. (*Smith, supra*, 187 Cal.App.3d at pp. 906–907, 910 & fn. 2.)

At trial, a psychiatrist testified Smith was gravely disabled because her mental disorder "caused behavior which brought her into conflict with the community." (*Smith, supra*, 187 Cal.App.3d at p. 907.) However, the psychiatrist also testified Smith could feed and clothe herself and provide for her own place to live. (*Ibid.*)

The appellate court found this evidence insufficient to prove Smith gravely disabled, noting the record revealed she was able to obtain food, clothing, and shelter and accepted offers of help from others. (*Smith, supra*, 187 Cal.App.3d at pp. 910–911.) The court concluded: "Despite her admittedly bizarre behavior, appellant is not, nor has she been, incapacitated or unable to carry out the transactions necessary to her survival. No evidence was adduced to show that appellant, because of her mental condition, was suffering from malnutrition, overexposure, or any other sign of poor health or neglect. Her refusal to seek shelter is not life threatening." (*Id.* at p. 910.)[4]

According to Carol: "If a conservatee such as Smith can be said to provide for her own shelter without having any housing at all, then certainly Carol is a much less serious case. Smith was living on the street. Carol is not. Carol lives under a roof, even if it is a series of roofs."

■ Here, however, Dr. Quanbeck and Wight both testified about incidents in which Carol refused food and water and ended up dehydrated and hospitalized. Dr. Quanbeck and Wight also testified that Carol's paranoid delusions about being beaten by staff caused her to lose numerous placements. Carol's testimony underscored her paranoia and inability to trust others who were trying to help her. Unlike in *Smith*, the court had before it testimony that Carol lacked the ability to provide for her own shelter.

## V.

Carol also argues the LPS Act must be interpreted to include a requirement of serious difficulty in controlling dangerous, violent, criminal behavior, and no evidence at trial supported such a finding. Carol bases this requirement on *In re Howard N.* (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] (*Howard N.*). However, *Howard N.* considered section 1800, which requires a finding that a juvenile "would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality" prior to a juvenile commitment. (§ 1800; see § 1800.5.) The Supreme Court held the juvenile's right to due process requires a finding that the mental deficiency or disorder causes the juvenile to have serious difficulty controlling his

---

[4] The court also noted its conclusion might have changed had more extensive testimony as to the effect of Smith's behavior on her health and well-being been elicited. (*Smith, supra*, 187 Cal.App.3d at p. 910.)

dangerous behavior. (*Howard N., supra*, 35 Cal.4th at p. 135.) The juvenile in *Howard N.* was detained because of his potential to commit a sexually violent offense. The court concluded there was no reason to treat sexually violent predators differently from other dangerous mentally ill persons. (*Id.* at p. 131.)

Here, we consider whether Carol is gravely disabled under the LPS Act, not whether Carol is dangerous to the public. The LPS Act and the Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.) are different statutory schemes with different purposes and provisions. The Sexually Violent Predators Act scheme provides greater procedural safeguards. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253–254 [127 Cal.Rptr.2d 177, 57 P.3d 654].) The requirements imposed under *Howard N.* are directed at the involuntary civil commitment of individuals who are unable to control their behavior and pose a danger to the public. (*Howard N., supra*, 35 Cal.4th at p. 128.) Nothing in *Howard N.* supports Carol's conclusion that these requirements apply to the LPS Act.

## DISPOSITION

The judgment is affirmed.

Hull, J., and Butz, J., concurred.