Filed 2/27/14  Conservatorship of Kathleen M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| Conservatorship of the Person and Estate of KATHLEEN M. | C071630 |
| RICHARD J. BURTON, as Public Guardian, etc., | (Super. Ct. No. SMH0000407) |
| Petitioner and Respondent, | |
| v. | |
| KATHLEEN M., | |
| Objector and Appellant. | |

Kathleen M. appeals from the order reappointing a Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5000 et seq.)[1] conservator of her person and estate.  She contends:  (1) there is not substantial evidence to support the trial court's finding that she

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

was presently gravely disabled; (2) there is not substantial evidence to support the imposition of special disabilities denying her the rights and privileges to possess or carry firearms, possess a driver's license, enter into contracts, refuse psychiatric treatment, give or withhold consent to medical treatment unrelated to her disability, and vote; and (3) there is not substantial evidence to support the grant of "special powers" to the conservator.

We conclude that there is substantial evidence supporting the trial court's finding that Kathleen is gravely disabled and granting the conservator special powers. We also conclude that there is substantial evidence supporting the imposition of all the special disabilities, except the denial of Kathleen's right to vote. We remand to the trial court to restore Kathleen's right to vote. In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

At the time of the proceedings, Kathleen was 61 years old. She suffers from schizophrenia, undifferentiated type, which is one of the more severe types of schizophrenia. She has been conserved for several years and is currently placed at a skilled nursing facility. Her schizophrenia manifests in chronically significant delusions and behavioral problems associated with those delusions, including agitation, very poor spending decisions, and being easily confused. Kathleen also has diabetes. Because of the confusion related to her mental illness, she is not able to manage the diabetes. Her inability to manage her diabetes is the reason the public guardian placed her in a skilled nursing facility.

Dr. Blair Romer, a psychiatrist with Placer County Mental Health, testified as an expert in the diagnosis and treatment of mental disorders. Over the course of Kathleen's multiple conservatorships, Dr. Romer has interviewed her repeatedly and reviewed the public guardian's records, although he has never been her treating doctor. Kathleen has consistently had delusions she is pregnant, sometimes with multiple babies, has millions of dollars in lottery winnings, and owns multiple houses.

2

Dr. Romer interviewed Kathleen the day of the reappointment hearing. She was not "so sure" about being wealthy. She reported her disability income had stopped and she had no financial resources. She acknowledged she sometimes believes she is pregnant and then said "I don't participate in sexuality, but I'm either fat and sassy or pregnant." Kathleen has only a vague plan of what she would do if she were released from conservatorship. She would probably live somewhere in Placer County, possibly in Roseville, maybe in an apartment. Upon further questioning, she was unable to provide any specific details.

Dr. Romer concluded that as a result of her mental disorder, Kathleen was not able to provide for her own needs of food, clothing, or shelter. He testified she is still easily confused and delusional. She does not have a good sense of her money, how to spend it, or how to maintain housing. She has consistently denied any mental illness in the past, as well as during the interview prior to the hearing. She was emphatic that she does not suffer from schizophrenia and does not need medications that would treat schizophrenia, including any antipsychotic medications.

At the hearing, prior to her testimony, in response to her own attorney's request for a continuance to prepare her testimony, Kathleen volunteered she had an honorary law degree and had "spent ten years studying some." During her testimony, Kathleen provided the address of her current residence and identified it as an elder hospital. She testified she had lived there for about six years. If she did not live there, she would live in an apartment. She testified she had two trust accounts in Placer County. She was unsure how much money was in the accounts, but was "sure there's quite a bit." She also said she had "reimbursement of California courts" that she has never used, noting that she had "been to court quite a few times." Also, the California State Controller had called her himself to inform her she had a "check sitting there." The auditor controller told her there were eight checks, but she could not "touch" them because they needed a signature. She also had a joint account with her mother at Sunrise Bank and she had a Golden One

3

account, which was "minus $17.99." While on conservatorship, she received $3 every six weeks from Social Security. If she were not conserved, she would receive about $920 a month. In addition, she had won the lottery and had three tickets worth at least $20,000 each. She planned to use those winnings to support herself.

She estimated an apartment would cost from $595 a month for a studio to $950 a month on up. As for providing food for herself on a daily basis, when asked if she would take the bus or a taxi to a grocery store or a restaurant, she answered, "Yes. I did it with my daughter and myself, certainly. Once a month, you know, I mean, you have to go buy groceries. I buy 'em weekly or every two-weekly. Or everybody else does it. Take a taxi once a month. I mean, once a month. If you live somewhere central you can catch a taxi and go, till you meet friends or something." She estimated it would cost $80 to $100 a month for groceries. As for clothing, if she needed new clothes, she would take the bus to go shopping, but did not mention what her clothing budget would be.

As for the diagnosis that she had a mental illness, she testified: ". . . I had a nervous breakdown when I was very young and I got caught up in mental illness, a mental illness situation. I've never cut myself. These are from someone else scratching me (indicating), trying to -- just in my sleep (indicating)." She stated she had schizoaffective disorder-bipolar type, but she did not agree she was "pure schizophrenic." She stated she takes lithium, Abilify, Metformin for her insulin, vitamins, baby aspirin, and Tylenol for pain. If she were not conserved she would continue taking the medications -- "I don't have to be forced. I just get reprimanded somehow."

When asked on cross-examination to explain how her purported schizoaffective disorder affects her, Kathleen answered, "Do you see me? And that's no medication. The only time I'm not drugged out -- it doesn't make me crazy. I've never killed anyone. I've never hurt anyone. I may get a little mouthy sometimes, but so does everyone else. When I get pushed to a situation I usually just walk away. I'm not a killer." She remembered testifying at her previous conservatorship hearing that she was pregnant, and

4

explained: "Well, I was delusional then. I was on quite a bit of medication. And I don't believe that was last year. I was told the law was two years." She believed "[f]antasy and [her] medication" made her delusional.

With respect to the imposition of special disabilities, the parties stipulated the trial court could consider the declarations Dr. Romer and Dr. L.S. Ramanujam filed in support of the reappointment petition. In his declaration signed approximately three months before the hearing, Dr. Ramanujam declared that Kathleen: (1) should not have the privilege to operate a vehicle, as her confusion and delusions would put her and others at risk; (2) should not have the right to enter into contracts as she is confused and delusional over 75 percent of the time and her judgment is impaired; (3) should not have the right to refuse or consent to treatment related to her grave disability, as she is very delusional, claims she is pregnant with Donald Trump's twins and was giving one up for adoption; (4) should not have the right to refuse or consent to routine medical treatment unrelated to her grave disability, as she shows profound impairment and her mental illness causes her to make poor choices and decisions; (5) should not have the right to possess a firearm, because her mental illness keeps her very confused and delusional; and (6) should not have the right to vote, as her "mental status is not functioning like a regular person, she thinks the President is still Reagan who she claims is her uncle."

The trial court accepted Dr. Romer's testimony and found Kathleen remained gravely disabled and unable to provide for her food, clothing, and shelter as a result of her mental disorder. The trial found the reappointment of the conservator "is necessary and in the best interest of the Conservatee." The court also expressly found Kathleen "is in need of medical and/or psychiatric treatment and is incompetent to give consent or approval for said treatment." Accordingly, the court reappointed the public guardian as the conservator of Kathleen's person and estate. The court imposed special disabilities prohibiting Kathleen from: possessing a driver's license, possessing a firearm, entering into a contract, refusing or consenting to treatment specifically related to her grave

5

disability, refusing or consenting to routine medical treatment unrelated to her grave disability, and voting. The court also granted the conservator a number of additional powers, including the power to contract, operate a business, sell or purchase real or personal property, exercise stock options and employ attorneys.

## DISCUSSION

### I. Grave Disability

Kathleen contends there is not substantial evidence supporting the trial court's decision to reappoint the conservator, as there is not substantial evidence she is gravely disabled. We disagree.

In proceedings under the LPS Act, the public guardian must prove beyond a reasonable doubt that the proposed conservatee is presently gravely disabled. (§ 5350; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235; *Conservatorship of Jones* (1989) 208 Cal.App.3d 292, 302-303.) As relevant in this case, to establish a person is "gravely disabled," the evidence must support an objective finding that due to mental disorder, a person "is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A); *Conservatorship of Carol K*. (2010) 188 Cal.App.4th 123, 134 (*Carol K.*).) "We review the record as a whole in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence. Substantial evidence, which is evidence that is reasonable, credible, and of solid value, also includes circumstantial evidence. [Citation.]" (*Carol K.*, *supra*, at p. 134; *Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577.)

Kathleen does not challenge the sufficiency of the evidence that she has a mental disability. She challenges only the finding that her mental disability renders her unable to meet her personal needs for food, clothing, and shelter. Actually, Kathleen's repeated contention is that there is not substantial evidence that she "cannot eat, dress, or take shelter." The statute does not require the public guardian to demonstrate the proposed conservatee cannot "eat, dress, or take shelter." Rather, the standard is whether Kathleen

6

*can provide for her basic personal needs for food*, *clothing*, *or shelter.* The evidence supports the conclusion that she cannot.

The record demonstrates Kathleen lacks insight into her mental illness. Throughout her mental health history, Kathleen has consistently denied she has any mental illness, is emphatic she does not have schizophrenia, and insists she does not need medication to treat schizophrenia. At the hearing, she continued to deny she was "pure schizophrenic," claimed she always took her medications, but got reprimanded anyway, and claimed "[f]antasy and [her] medication" made her delusional.

Moreover, as a result of her mental illness, Kathleen is easily confused and suffers significant delusions as to her financial means, including that she has: lottery winnings of over $60,000, two trust accounts with "quite a bit" of money, eight reimbursement checks from the state controller's office, and multiple homes. She plans to support herself with the lottery winnings. She also stated, however, that she has no financial resources. Despite her testimony that she would probably get an apartment if she were released from the conservatorship, Kathleen had no specific plans where she would live, how she would obtain an apartment, or how to maintain housing. Kathleen's delusions regarding her financial means directly affect her ability to evaluate her actual financial situation and provide for herself. We conclude that the trial court could reasonably infer that her delusional beliefs regarding her wealth and property impede her ability to provide food, clothing and shelter for herself.**2**

------

**2** We reject the argument advanced by counsel for Kathleen on appeal that "If she found out her wealth was a mere delusion, there was no evidence that she would then stop eating, dressing, or taking shelter." First, given Kathleen's mental health history, the evidence does not support the notion that Kathleen will somehow "find out" that her wealth is a delusion. Second, as noted, the issue is not whether her mental illness prevents her from eating, dressing or taking shelter. Rather, the issue is whether the evidence established that due to Kathleen's mental illness, she was unable to *provide for* her personal needs for food, clothing or shelter. Third, in our substantial evidence

7

In addition, Kathleen suffers from diabetes.  For Kathleen, the ability to provide for her *personal* basic need of food requires more than an idea of budget and transportation; it requires consideration of the dietary constraints and requirements of managing her diabetes.  However, the confusion resulting from her mental illness has made her unable to manage her diabetes.  The trial court could reasonably infer that Kathleen's delusions and confusion would impede her ability to provide food appropriate to manage her diabetes and therefore, prevent her from providing for her personal need for food.  On the record before us, there is substantial evidence to support the finding that Kathleen is gravely disabled.

## II.  Special Disabilities

Kathleen next contends there is not substantial evidence to support the trial court's imposition of the special disabilities denying her the rights and privileges to possess or carry firearms, possess a driver's license, enter into contracts, refuse psychiatric treatment, give or withhold consent to medical treatment unrelated to her disability, and vote.  We agree only as to the right to vote.

A finding of grave disability alone is not sufficient to justify the imposition of the various special disabilities enumerated in section 5357.  (§ 5005; *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1313 (*Riese*).)  The conservatee retains the rights and privileges covered by the special disabilities unless the court, after making separate findings of incapacity to support the imposition of the special disabilities, imposes those disabilities and confers corresponding authority on the conservator.  (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165 (*George H.*); *Riese*, *supra*, 209 Cal.App.3d at p. 1313.)  "The party seeking conservatorship has the burden of producing evidence to support the disabilities sought,

review, our focus is on whether there is substantial evidence supporting the court's judgment, and there is.

8

the placement, and the powers of the conservator, and the conservatee may produce evidence in rebuttal. [Citation.]" (*George H.*, *supra*, 169 Cal.App.4th at p. 165.) In other words, there must be evidence in the record to support each of the specific disabilities imposed. (*Id.* at pp. 165-166.)

## A. Right to Possess a Firearm

To support a limitation on a conservatee's ability to possess a firearm or deadly weapon, the court must find "that possession of a firearm or any other deadly weapon by the person would present a danger to the safety of the person or to others." (§ 8103, subd. (e)(1).) Here, Dr. Rumanujam declared that, as a result of Kathleen's mental illness, she is confused and very delusional. Dr. Romer testified Kathleen's delusions resulted in behavioral problems, including agitation. There was also evidence Kathleen had poor judgment and made poor choices. Kathleen's trial testimony also demonstrated significant confusion and delusions. A firearm in the hands of a confused and delusional person would present a danger to that person and others. This was substantial evidence from which the court could conclude Kathleen could not safely possess a firearm.

## B. Right to a Driver's License

Similarly, the overriding concern in the issuance of a driver's license is generally whether the person is able to operate a motor vehicle safely. (Veh. Code, §§ 12800, subd. (g), 12805, subd. (c), 12806, subd. (c); *People v. Superior Court* (*Wilson*) (1993) 18 Cal.App.4th 31, 36-37.) Mental disorders may affect a person's "ability to exercise reasonable and ordinary control in operating a motor vehicle" and may be the basis for refusing that person a driver's license. (Veh. Code, §§ 12800, subd. (g), 12806, subd. (c).) Dr. Rumanujam declared Kathleen's delusions and confusion would put her and others at risk if she were permitted to operate a vehicle. In addition, there was evidence she had poor judgment and made poor choices. This was substantial evidence supporting the conclusion Kathleen could not operate a motor vehicle safely.

9

## C. Right to Enter into Contracts

Under Civil Code section 1556, persons of "unsound mind" are not capable of entering into contracts. There are essentially three classifications of incapacity based on an "unsound mind" -- (1) entirely without understanding (Civ. Code, § 38); (2) unsound but not entirely without understanding; and (3) susceptible to undue influence (Civ. Code, § 39; *Smalley v. Baker* (1968) 262 Cal.App.2d 824, 834-835). Here, Dr. Rumanujam indicated that Kathleen is delusional and confused over 75 percent of the time and her judgment is impaired. Her delusions that she had millions of dollars in lottery winnings, multiple homes, and trust accounts with "quite a bit of money" were further evidence that she is without understanding about her financial situation and is susceptible to undue influence. This is substantial evidence supporting the denial of her right to contract.

## D. Right to Refuse or Consent to Medical Treatment

In *Riese*, the Supreme Court outlined the factors courts must evaluate in considering whether a gravely disabled person is incapable of making medical treatment decisions: "(a) whether the patient is aware of his or her situation (e.g., if the court is satisfied of the existence of psychosis, does the individual acknowledge that condition); (b) whether the patient is able to understand the benefits and the risks of, as well as the alternatives to, the proposed intervention . . . ; and (c) whether the patient is able to understand and to knowingly and intelligently evaluate the information required to be given patients whose informed consent is sought (§ 5326.2) and otherwise participate in the treatment decision by means of rational thought processes." (*Riese*, *supra*, 209 Cal.App.3d at pp. 1322-1323.)

Using these criteria, the record supports the trial court's finding that Kathleen was incompetent to make medical decisions, both related to her grave disability and unrelated

10

to it.[3]  Kathleen consistently denied she had a mental illness and believed the medications she is given for her mental illness cause her delusions.  Her confusion and delusions have impaired her ability to manage her diabetes.  In addition, she regularly believes she is pregnant.  Dr. Rumanujam declared Kathleen should not have the right to refuse or consent to treatment because of her delusions, including her delusion of pregnancy.  The doctor also declared Kathleen should not have the right to refuse or consent to treatment because she shows profound impairment and her mental illness causes her to make poor choices.  This evidence supports the finding that Kathleen is incompetent to make medical decisions, as it demonstrates a lack of awareness or acknowledgment of her condition, an inability to understand proposed interventions and an inability to understand and evaluate the information given to her and to participate in treatment decisions with a rational thought process.

### E.  Right to Vote

As relevant here, the Elections Code provides that a person shall be disqualified from voting if a conservator of the person and estate is appointed and the person is "not capable of completing an affidavit of voter registration in accordance with [Elections Code] section 2150."  (Elec. Code, § 2208, subd. (a)(2).)  Essentially, Elections Code section 2150 requires that the affidavit show the affiant's name, place of residence, mailing address, date of birth and driver's license or social security number, state or country of birth, occupation, political affiliation, prior voter registration, and that the affiant is not currently imprisoned or on parole for a felony conviction.  There is no evidence supporting the finding that Kathleen is not capable of completing an affidavit of voter registration.

---

[3] Based on the record in this case, we address these disabilities together.  We acknowledge, however, these are distinct disabilities, to be imposed and considered separately by the trial court.

11

Dr. Rumanujam's declaration states Kathleen should be denied the right to vote because her "mental status is not functioning like a regular person, she thinks the president is still Reagan who she claims is her uncle." This is certainly evidence that Kathleen is confused and delusional. As we have noted, the record also supports the conclusion that Kathleen's judgment and insight are impaired. However, under the statutory scheme, confusion, impaired judgment, and lack of insight are not grounds for a disqualification from voting.

There was no evidence presented on Kathleen's ability to complete a voter registration affidavit and no testimony on the salient points delineated in the statute which constitutes an ability to complete the voter registration affidavit. Nor did Kathleen's testimony fill the evidentiary void. In her testimony, Kathleen correctly identified where she currently resided. She was not asked any other questions relevant to her ability to complete a voter registration affidavit. There simply is not evidence in this record that Kathleen was unable to complete an affidavit of voter registration. Accordingly, we cannot uphold the imposition of that special disability.

### III. Special Powers

Kathleen's final contention is that the special powers granted to the public guardian under the conservatorship are not supported by substantial evidence. Again, we disagree.

"The purpose of a conservatorship is to provide a legally competent person to act, under the court's guidance, as the conservatee's agent in the management of estate property. [Citations.] A conservator has control of the estate, which is held in trust for the benefit of the conservatee. [Citations.] A conservator, under the court's scrutiny, has the power to make decisions on behalf of the conservatee. This includes exercising legal rights a conservatee had as a trustor. [Citations.]" (*Brown v. Labow* (2007) 157 Cal.App.4th 795, 814-815.) The trial court may grant a conservator of the estate the additional powers specified in Probate Code section 2400 et seq. and section 2591 "if the

12

court determines that, under the circumstances of the particular guardianship or conservatorship, it would be to the advantage, benefit, and best interest of the estate to do so." (Prob. Code, § 2590, subd. (a); Welf & Inst. Code, § 5357.) There is no requirement that the trial court provide a specific statement on the record of the reasons for each power. (*George H.*, *supra*, 169 Cal.App.4th at p. 165.)

Here, the trial court found it was in Kathleen's best interest to grant the conservator the special powers delineated in Probate Code section 2591, as well as the power to contract for the conservatorship and employ and pay attorneys, accountants, investment counsel, agents, depositories and employees. The record demonstrating Kathleen's confusion, delusions (particularly those regarding her finances), poor spending choices, limited insight, and poor judgment provides substantial evidence supporting these special powers.

## DISPOSITION

The matter is remanded to the trial court with directions to restore Kathleen's right to vote and to notify the county elections official that her right to vote has been restored. In all other respects, the order reappointing a conservator, imposing special disabilities, and granting special powers is affirmed.


                                                   _____MURRAY_____, J.



We concur:



_____RAYE_____, P. J.



_____HOCH_____, J.

13