Filed 12/27/23  Conservatorship of R.J. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of R.J.<br><br>PUBLIC GUARDIAN OF CONTRA COSTA COUNTY,<br><br>     Petitioner and Respondent,<br><br>v.<br><br>R.J.,<br><br>     Objector and Appellant. | A167977<br><br>(Contra Costa County<br>Super. Ct. No. P21-00551) |

Appellant R.J. challenges an order reappointing respondent Public Guardian of Contra Costa County (Public Guardian) as the conservator of her person under the Lanterman-Petris-Short (LPS) Act.  (Welf. & Inst. Code,[1] § 5000 et seq.)  The order followed a jury finding that R.J. was beyond a reasonable doubt "gravely disabled" in that she could not provide for her basic needs of food, clothing, or shelter because of a mental disorder.  (§ 5008, subd. (h)(1)(A).)  R.J. argues on appeal that although the Public Guardian adduced ample evidence to prove that she is schizophrenic, substantial

---

[1] All further statutory references are to the Welfare and Institutions Code.

1

evidence does not support the jury's finding that she is unable to obtain food, clothing or shelter. We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 20, 2021, the Public Guardian filed a petition for the appointment of a conservator for R.J. R.J. objected to the petition, but later withdrew her objection and accepted the conservatorship. On July 22, 2022, the Public Guardian filed a Petition for Reappointment of Conservator. R.J. objected to the reappointment and requested a jury trial.

The jury was sworn on April 12, 2023, and heard testimony from Deputy Conservator John Decker and from R.J. on April 17 and 18. Three exhibits were admitted into evidence: records for R.J. from John George Psychiatric Hospital, from Villa Fairmont Mental Health Rehabilitation Center, and from Contra Costa Regional Medical Center.

A.    *Testimony of John Decker*

Deputy Conservator Decker was qualified as an expert in the fields of psychological symptoms and diagnosis, the identification of categories of psychopharmacological medications and the symptoms they are used to treat, and the evaluation of patients for grave disability. He testified that he had been R.J.'s conservator since April 2021, and had met with her many times since then. When he met with her, he would go to her location and "tr[y] to interview her as to . . . how she was doing, what her specific needs were, whether she was medication-compliant," and would also evaluate as to whether in his view "she was doing well, whether she was decompensating, whether she was programming well." Specifically to prepare for the hearing, he met with her three times in the preceding six weeks, but each of those meetings lasted only six or seven minutes because R.J. ended them.

2

Decker diagnosed R.J. with schizophrenia based on his observations during interviews with her, a conversation with her attending psychiatrist at the Contra Costa Regional Medical Center, and the records from the John George Psychiatric facility, Villa Fairmont, and Contra Costa Regional Medical facility, all of which were places where R.J. has lived and received treatment. Decker testified that R.J. demonstrated symptoms of schizophrenia including auditory hallucinations (R.J. was reported as conversing and gesturing to people who were not present as though she were trying to make a point); sexual preoccupation (on multiple occasions she talked about sexual situations that she imagined were occurring, such as when she yelled at a facility staff member, "Your husband raped me, he fucked me without a condom"); pressured speech (speaking quickly with words running together); tangential speech (speech jumping from topic to topic); grossly disorganized behavior and inability to regulate emotions, which are problems with executive functioning (such as when R.J. became extremely agitated and upset when Decker brought her clothing she had requested from storage, claiming that he had brought the wrong things); and persistent delusions, both paranoid (she accused Decker of spending all her money, accused her roommate of being a prostitute, and did not trust milk or water from the facility, with which she would take medication) and grandiose (such as telling Decker that she was wealthy and that she was related to Steven Spielberg and George Lucas).

Decker testified that when a person lacks insight into a psychiatric illness, it affects their ability to take care of themselves with respect to their symptoms. He testified that R.J.'s denial that she experienced auditory hallucinations was indicative of a lack of insight, as was a statement she was reported to have made at the hospital: "I don't take pills, I can heal myself."

Decked testified that R.J. was prescribed clozapine for her psychiatric symptoms. He observed that although R.J. reported to her doctor that she likes clozapine and understands that it is helping her, and although she has stated that she is not interested in trying any other medication, she refuses the blood draws that are required for patients taking clozapine. R.J.'s inability to comply with the clozapine regimen showed that she may not be able to continue taking her medications on her own, which was something he considered in evaluating grave disability. The notation in R.J.'s records that she "took medications with prompting" indicated to Decker that staff had to encourage R.J. to take her medication; he testified that if someone needs prompting to take medication or needs someone to tell them when to take medication, that effects his evaluation of whether a person would take the medication without supervision. Decker testified that reports that R.J. yelled at medical staff about medication, insulted and cursed at staff, and made statements to staff such as, "You're going bald. How does that hair taste?" and "How do you kill a god?" indicated that R.J. had difficulty working with staff and mental health clinicians, which reflected a lack of insight into her illness and which he considered in evaluating whether a person can meaningfully engage in treatment on their own. Decker opined that R.J. did not demonstrate insight into her schizophrenia, as reflected in her continuing to engage in behavior that was detrimental to her well-being without awareness that she was doing so. And he opined that the level of R.J.'s disorganization, her lack of insight into her behaviors, and her persistent delusions would render her unable to plan, maintain, and self-administer her medications.

Decker testified that a person's ability to regulate emotional response was relevant to whether a person's symptoms made them unable to provide

4

for their food, clothing or shelter because the inability to regulate emotions could cause difficulties in personal interactions with people, including sales clerks or cashiers, and prevent a person from getting what they want. He also testified that pressured speech, which makes it "hard to insert your own questions or have conversation," and paranoia, could be very disruptive in normal communication and interaction, which could make it very difficult for a person to have their needs met. He testified that R.J. had demonstrated trouble interacting with people, including mental health staff, in "fairly benign" situations, and testified, "[I]f you're in a community and cannot interact productively, then it's going to interfere with your ability to get food, clothing, and shelter."

And he opined that a hypothetical person who suffered persistent paranoid and grandiose delusions, experienced auditory hallucinations, struggled to regulate agitation and emotions, and struggled with executive functioning would have a diminished capacity to participate in normal activities, and that it "would be extremely difficult" for such a person to provide for food, clothing and shelter.

B.      *Testimony of R.J.*

R.J.'s attorney began R.J.'s direct examination by asking where she would go if she were to leave the facility where she is currently located. R.J. responded that she would go to a Walmart at a particular mall in Antioch. Asked by her attorney why she would go there, R.J. responded, "Because over the last two years, I was a participant in two movies. And I've always had a life of Hollywood, even though nobody seems to be able to find—." Her attorney then asked what she would buy at Walmart, and R.J. responded, "I would probably just go to the neighborhood and look and see if there are any friends in the neighborhood." Asked by her attorney whether she had friends

5

in that area, R.J. responded, "Yeah," and continued, "I would go to Antioch because over these last two years I helped make two cartoons called 'Internal Revenue Services' and 'Immigration Services.' "

Eventually, R.J. testified that her preference as to where to go for shelter if she were released from her current facility would be "going with friends." Asked about what her second choice would be if she could not stay with friends, she said "my backup plan is to definitely get in contact with people that are aware of me." On cross-examination, she elaborated on the second choice: "I mean that people that I've worked with the last two years. I was in the Immigration Services, Internal Revenue Services cartoon, and I was in two movies that came out, Mulan III, and Seth Meyers and Bill Cosby, Save the Planet Earth, while I was in custody of mental health people at the hospital." She testified that if she could not reach her friends, she would reach out to those people, "And also to musicians Brandi, Aaliyah, Sade, Madonna, and Janet Jackson for compensation for the work as I did as a youth, singing songs and doing videos." R.J. testified if she would go to a shelter next, and she identified a particular shelter she would want to go to. She stated that although she had not been to a shelter in the past two years, she had been to one before that, and that at one point, she was placed in a shelter four days later than she intended, and was homeless for four days. R.J. testified that she would be open to going to a board and care facility, and that a person got a bed at a board and care facility by showing up and asking them to let you in.[2]

R.J. testified that she knew her clothing size and would buy clothes at Walmart. She testified that she knows how to prepare food she likes to eat,

---

[2] Decker, recalled as a rebuttal witness, testified that people cannot just walk into a board and care facility and expect a bed.

and would buy food at Safeway, or get fast food at Taco Bell, McDonald's or Wendy's. She testified that she understood she was an SSI recipient, and that she knew there was a government benefits office in Richmond, and she had been there in the past.

Asked by her attorney whether she had a mental illness diagnosis, R.J. responded, "Because of my work in Hollywood on The Shining, the Doll Face, The Heart, Without It, The Brain Has It, when I was physically operated on and experienced pain, that's my phone work and—" At that point, her attorney broke in, and the court stated, "Hold on, she needs to finish. Are you finished with your answer, ma'am?" R.J. replied, "No, I'm not. [¶] And I—when I was a teenager, a preteen, I was in all the horror movies. And The Shining is one where you see me with long hair running through being chased by Jack Nicholson and then physically abusing me." Asked whether she had been diagnosed with schizophrenia, R.J. responded, "I—they tried to say I've had anything, whether it's been schizophrenia, bipolar, depression. Bipolar, manic depression are the same thing. Schizophrenia is when you get nervous around people and you get antsy and you don't look as pretty. So that's what they tried to say about me. I was really—" The court then stated, "Let's stop. Next question." On cross-examination, questioned about whether she had a mental health disorder, R.J. responded, "Well, I think by exposure to snuff films, horror films, and mistreatment in Hollywood is the reason why I am the way I am. I don't think it's something that I had from childhood all the way throughout my life which would indicate that I'm a mental health survivor. [¶] But I believe that certain situations were highlighted that other people don't understand why it happened. I was caught on a tape a long time ago when I was like 12 or 13 playing with myself because they wouldn't let me leave a courtroom from the OJ Simpson trial.

And I played with myself because they wouldn't let me go.  [¶] And then I was like, 'This is dirty.  Let me leave.'  [¶] And they asked me who taught you?  [¶] And I had to say my adoptive mother [name redacted], and Beyonce Knowles.  So those are the girls who taught me about—and if you look on the web, you can see a little girl playing with herself at the OJ Simpson trial.  Because that's what they told me I had to do when I was ever upset, just play with myself.  It happened one time and never again.  It's embarrassing."  R.J. stated that when Decker had testified about the symptoms of schizophrenia, he was "talking about my looks failing.  He doesn't seem to recognize that the meds make your looks fail.  And the people at the place I'm staying with, they hate my guts.  They hate my guts."

R.J. testified that she currently took the medications clozapine and Haloperiodol.  Asked what they helped with, she responded, "They don't help me with anything.  I'm always the quiet person.  I'm always the person not fighting.  I'm always the person that when I go in the TV room at 2:00 p.m. to watch General Hospital, if there's someone in there already watching, then I go back to my room.  That's the type of person I am.  [¶] I cannot hog a TV or video link just because I'm in the mood to watch something.  Whether it's for coping or not, that's what the room is for."  Asked what she thought would happen if she stopped taking her medication, she responded, "Nothing.  Better health.  That would mean that I could leave the hospital and not be surrounded by people who don't care for me.  And that's my main objection, they don't care for me.  They—"  The court interjected, "I'm sorry, I'm going to stop you, Ms. J[ ]."  R.J. testified that she was willing to work with a doctor to figure out the right medications for her, and that she would listen to a doctor if they told her to take certain medications "as long as they had an issue with not providing me too many meds."

R.J. spoke out of turn repeatedly during the questioning of Decker, sometimes making remarks having nothing to do with the issues being discussed.[3] And R.J. repeatedly interrupted opposing counsel's rebuttal closing argument with outbursts, despite several requests by the court that she allow the attorney to finish.

C. *Verdict*

The jury returned a unanimous verdict that R.J. was gravely disabled due to a mental disorder. The trial court reappointed the Public Guardian as conservator and ordered R.J. placed in a mental health regional center with various disabilities. This appeal timely followed.

## DISCUSSION

A. *Applicable Law and Standard of Review*

The LPS Act provides that "[a] conservator of the person . . . may be appointed for a person who is gravely disabled as a result of a mental health disorder" (§ 5350), where "gravely disabled" is defined as "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).)

To establish or renew a conservatorship under the LPS Act, the public guardian must prove beyond a reasonable doubt that the proposed conservatee is gravely disabled. (*Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 696.) "[T]o establish that a person is gravely disabled, the

---

[3] For example, in response to a question as to why he believed R.J. did not demonstrate insight into her schizophrenia, Decker responded, "Well, she continues to engage in behavior that's detrimental to her—her own well-being. She's not aware that she's doing that." R.J. interrupted him: "I am. I have been in soap operas, remember that, All My Children, One Life to Live, Santa Barbara."

evidence must support an objective finding that the person, due to mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for his or her basic needs of food, clothing, or shelter." (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.)  Evidence that a person lacks insight into his or her mental illness, that a person feels no need to take medication, that person cannot provide for himself or herself without medication, and a person would not take the medication without supervision supports a finding that the person is gravely disabled.  (*Conservatorship of Guerrero* (1999) 69 Cal.App.4th 442, 446.)

We review a finding of grave disability for substantial evidence, and therefore "[w]e review the record as a whole in the light most favorable to the trial court judgment to determine whether it discloses substantial evidence." (*Conservatorship of Carol K.*, *supra*, 188 Cal.App.4th at p. 134.)  The testimony of a single witness may constitute substantial evidence to support a finding of grave disability.  (*Ibid.*)  Substantial evidence is "evidence that is reasonable, credible, and of solid value" (*ibid.*) and "includes circumstantial evidence and the reasonable inferences flowing therefrom."  (*Conservatorship of Walker* (1989) 206 Cal.App.3d 1572, 1577.)  We do not reweigh the evidence:  the question before us is whether, viewing the evidence in the light most favorable to respondent, a rational trier of fact could have made the finding beyond a reasonable doubt.  (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1007-1008 [discussing substantial evidence review where prosecution must prove guilt beyond a reasonable doubt].)

B. *Analysis*

Decker testified that R.J. exhibited symptoms of schizophrenia, and he testified as to the severity and pervasiveness of those symptoms.  He opined that a person exhibiting those symptoms would have a diminished capacity to

10

participate in normal activities and transactions, and that it would be extremely difficult for such a person to provide for his or her needs for food, clothing, and shelter. He testified as to interactions he had with R.J., and discussed evidence of her interactions with others. He testified that R.J. did not demonstrate insight into her illness, and opined that her lack of insight, combined with her symptoms, would render her unable to plan for and take her medications by herself. And, if that were not enough, R.J.'s testimony, and her behavior in court as reflected in the record, provided further evidence of R.J.'s lack of insight into her illness and her diminished capacity to interact with others, as she would need to do to meet her needs for food, clothing, and shelter. All of this is substantial evidence to support the jury's finding beyond a reasonable doubt that R.J. is gravely disabled: that because of her mental illness, she is "unable to carry out the transactions necessary for survival or otherwise provide for . . . her basic needs of food, clothing, or shelter." (*Conservatorship of Carol K.*, *supra*, 188 Cal.App.4th at p. 134.)

R.J. argues that the evidence that she was unable to provide for her basic needs was not based on any facts beyond her mental illness, and argues that there was insufficient evidence that her illness made her unable to provide for her basic needs. R.J. contends that because Decker did not offer any specific examples of R.J. having difficulties with people in the community, he was merely speculating that "his difficulties with appellant" would extend to others in the community, and that his testimony was "a classic 'bare opinion,' " unsupported by any facts. We disagree. As an initial matter, contrary to R.J.'s suggestion, Decker's opinion *was* fact-based insofar as it was based on his own interactions with R.J. For example, Decker testified about an interaction he had with R.J. in which she became extremely agitated and upset about clothing, which he viewed as a sign that

11

she was unable to regulate her emotions in a normal way. He testified about a meeting in which she was initially calm, but within about a minute became agitated, angry and upset, and used pressured and tangential speech, and accused him of spending her wealth. Moreover, Decker testified about R.J.'s difficulties in interacting with people other than himself, including her roommates and hospital staff, and explained how those interactions were indicative of interactions that would occur in the wider community.

Finally, R.J. argues that Decker's testimony was insufficient to support a finding of grave disability beyond a reasonable doubt in light of her own uncontroverted testimony that she knew how to make her favorite dishes and where to shop and obtain fast food, that she knew her size and where to shop for clothing, and that she had identified a particular shelter she might go to if she were released from conservatorship. This argument is not persuasive. It was the jury's role to weigh R.J.'s testimony against Decker's testimony that R.J.'s delusions and other symptoms would interfere with her ability to make plans to manage her illness, and that it would be extremely difficult for a person exhibiting R.J.'s symptoms to obtain the services she needs. We will not set aside the jury's verdict, given that it is supported by substantial evidence. (See *Conservatorship of Isaac O.* (1987) 190 Cal.App.3d 50, 57.)

## DISPOSITION

The order is affirmed.

 

_____
Miller, J.


WE CONCUR:


_____
Stewart, P.J.


_____
Richman, J.


A167977, *Public Guardian of Contra Costa County v. R.J.*