Filed 5/4/22  Conservatorship of R.P. CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Conservatorship of the Person of R.P. | |
| SAN FRANCISCO PUBLIC GUARDIAN, as Conservator, etc., <br><br>　　　Petitioner and Respondent, <br><br>v. <br><br>R.P., <br><br>　　　Objector and Appellant. | A163431 <br><br> (City & County of San Francisco Super. Ct. No. PMH-21-024542) |

　　　R.P. appeals from an order granting the petition of the San Francisco Public Guardian (Public Guardian) to establish a conservatorship for a one-year period after the court found her to be gravely disabled within the meaning of the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000 et seq.).[1]  R.P. challenges this order on the grounds that (1) she did not knowingly, intelligently and voluntarily waive her right to a jury trial; (2) substantial evidence did not support the order; and (3) she received ineffective assistance of counsel when her attorney failed to object to hearsay expert testimony.  We affirm.

_____

　　　[1] Unless otherwise stated, all statutory citations herein are to the Welfare and Institutions Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

## I.  Temporary Conservatorship.

On April 14, 2021, the Public Guardian filed a petition in superior court to be appointed R.P.'s temporary conservator under the LPS Act.  The accompanying declaration from Dr. Loren Roth, medical director at San Francisco Jail Behavioral Health and Reentry Services (JBHRS), recommended the conservatorship based on the following facts.  R.P., diagnosed with schizophrenia, was jailed on charges of child endangerment, battery on a public transit operator and battery on a public transit passenger.  R.P. had been evaluated 20 times by JBHRS since 2015, including nine times between July 2020 and April 2021.  She had been psychiatrically hospitalized at least 18 times since 2009 and spent nine months at Napa State Hospital after being found incompetent to stand trial in 2018 or 2019.  She frequently sought assistance at emergency departments in San Francisco, and last year she was among the top 5 percent of all emergency services users.  The frequency with which R.P. was being arrested was also rising, and she was averaging one arrest per month, mostly on violent charges.  During one incarceration, R.P. punched her arm through a window.

Typically, R.P. arrived in custody disheveled, agitated, paranoid, and lacking insight and impulse control.  She regularly presented with delusions.  Many of these related to sexual assaults that she later recanted or refused to explain or have examined.  Dr. Roth could not discount R.P.'s sexual assault reports given that she was unhoused and mentally ill.  Recently, on August 10, 2020, R.P. arrived at an emergency department and stated that she needed a vaginal exam because " 'something happened down there' . . . ."  Yet she refused the exam or to answer questions and twice demanded new

doctors. She was eventually escorted out by a security guard, whom she assaulted, causing her arrest.

Also in 2020, R.P. was placed on a "5150 hold" at the hospital where her mother was hospitalized. Her mother called 911 to report R.P. was chasing her brother with a knife. R.P.'s mother described R.P. as homeless and refusing to take her medication. R.P. previously stabbed another family member, giving her mother reason to take her conduct seriously.

R.P. received services from Citywide Focus until August 2018, when she assaulted her case manager, causing significant injuries. Because R.P. had engaged in several threatening incidents, Citywide Focus closed her case and assigned her to Citywide Psychiatric Emergency Services (PES). R.P., however, did not engage with the PES team.

Dr. Roth further reported R.P. decompensated rapidly in the community and did not take her prescribed medication or engage in mental health care. She was unable to keep court dates, resulting in continual warrants for her arrests. R.P. was also becoming increasingly symptomatic, causing an increase in her arrests and hospitalizations. The amount of time it took to stabilize her once she arrived into custody was also increasing. Dr. Roth concluded R.P. was unable to provide for her own food, clothing or shelter; lacked insight into her mental illness; and likely would not engage in mental health services apart from her emergency contacts. R.P. also lost significant weight in the past few years, and when asked where she obtained food, clothing or shelter, she provided vague answers such as " 'a shelter,' " " 'a friend,' " or her sister. She was often soiled and barefoot when placed into custody. Under these circumstances, Dr. Roth recommended a conservatorship and placement in a locked facility.

3

Attached to Dr. Roth's affidavit was affidavit B, a proposed court order authorizing forced psychotropic medication. According to this affidavit, R.P. was presently medication-compliant but indicated she would stop taking medication upon release. Between February 2017 and March 2021, medical professionals documented R.P.'s refusal to take medication or acknowledge her mental health illness 23 times. R.P. lacked insight into her illness on and off medication.

On April 14, 2021, the trial court granted the Public Guardian's petition and appointed a temporary conservator for R.P. The court also barred R.P. from possessing firearms or deadly weapons. The court temporarily declined to grant the affidavit B.

On April 27, 2021, a citation for LPS conservatorship was filed, requiring R.P. to appear at a May 13, 2021 hearing. R.P. was advised of her rights to appointed counsel and a jury trial should she choose to challenge the conservatorship.

## II. One-year Conservatorship.

The contested conservatorship hearing took place July 15, 2021.[2] R.P., represented by appointed counsel, waived her right to a jury trial. (See pp. 6–15, *post*.) The court then heard testimony from R.P. and Dr. Stephan Wyss, the psychiatrist who had been treating her for the past month at MHRC. (See pp. 15–18, *post*.) Afterward, the court found R.P. gravely disabled within the meaning of the LPS Act and appointed the Public Guardian as conservator over her person. The court also issued a written order prohibiting R.P. from possessing firearms. R.P. retained the right to

---

[2] On June 17, 2021, R.P. was moved from jail to the San Francisco Mental Health Rehabilitation Center (MHRC).

4

consent to treatment and psychotropic medication. At counsel's request, the court ordered a 90-day placement review. This appeal followed.

## DISCUSSION

R.P. raises the following issues for review: (1) Did she knowingly, intelligently and voluntarily waive her right to a jury trial? (2) Does substantial evidence support the trial court's conservatorship order? (3) Did she receive ineffective assistance from counsel when her attorney failed to object to hearsay testimony from Dr. Wyss? (4) Does substantial evidence support the court's order banning R.P. from possessing firearms or other deadly weapons? We address each issue in turn.

## I.    The LPS Act.

"The LPS Act governs the involuntary detention, evaluation, and treatment of persons who, as a result of mental disorder, are dangerous or gravely disabled. (§ 5150 et seq.) The Act authorizes the superior court to appoint a conservator of the person for one who is determined to be gravely disabled (§ 5350 et seq.), so that he or she may receive individualized treatment, supervision, and placement (§ 5350.1). As defined by the Act, a person is 'gravely disabled' if, as a result of a mental disorder, the person 'is unable to provide for his or her basic personal needs for food, clothing, or shelter.' (§ 5008, subd. (h)(1)(A).)

"Integral to the LPS Act is its procedure for ascertaining whether a conservatorship of the person should be established. Each county is required to designate an agency to undertake an investigation to aid the court in determining whether a conservatorship is appropriate (§ 5351), and the investigating officer must submit a comprehensive written report to the court prior to the conservatorship hearing (§ 5354). The written report must include 'all relevant aspects of the person's medical, psychological, financial,

5

family, vocational and social condition, and information obtained from the person's family members, close friends, social worker or principal therapist.' (*Ibid*.) It must also state whether the investigator recommends a conservatorship and, if not, identify all available alternatives. (*Ibid*.) When a conservatorship is recommended, the report must make recommendations concerning a suitable conservator, the powers and duties to be granted and imposed upon the conservator, the legal disabilities to be imposed upon the proposed conservatee, and the appropriate placement. (§§ 5355, 5356.)

" . . . The party seeking imposition of the conservatorship must prove the proposed conservatee's grave disability beyond a reasonable doubt, and a jury verdict finding such disability must be unanimous. [Citation.] An LPS conservatorship automatically terminates after one year, and reappointment of the conservator must be sought by petition. (§ 5361.)" (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142–143 (*John L.*).)

## II.   Waiver of Right to a Jury Trial.

The LPS Act affords a proposed conservatee such as R.P. the right to a jury trial. (Welf. & Inst. Code, § 5350; Prob. Code, §§ 1827–1828.) To proceed with a bench trial, the court must receive a personal waiver of this jury trial right from the proposed conservatee. (*Conservatorship of Kevin A.* (2015) 240 Cal.App.4th 1241, 1249.) "Generally, with respect to civil commitments, the failure of a court to obtain a valid jury trial waiver where required by statute 'denies the defendant his or her statutory right to a jury trial,' and is a ' "miscarriage of justice" within the meaning of California Constitution, article VI, section 13 [that] requires reversal without inquiry into the strength of the evidence in a particular case.' (*People v. Blackburn* (2015) 61 Cal.4th 1113, 1132–1133 [citations] [failure to obtain valid jury trial waiver from mentally disordered offender in civil commitment proceeding was

6

reversible error]; accord, *People v. Tran* (2015) 61 Cal.4th 1160, 1169 [citations] [trial court's acceptance of invalid jury trial waiver in commitment proceeding for defendant who pleaded not guilty by reason of insanity 'is not susceptible to ordinary harmless error analysis and automatically requires reversal']; see [*Conservatorship of*] *Heather W.* [(2016) 245 Cal.App.4th 378,] 384–385 [trial court's failure to advise LPS conservatee of her right to a jury trial was reversible error]; *Conservatorship of Kevin A.*[, *supra*,] 240 Cal.App.4th [at p.] 1253 [reversing conservatorship order where trial court erred in accepting counsel's waiver of LPS conservatee's right to jury trial over conservatee's objection]; [citation].'" (*Conservatorship of Joanne R.* (2021) 72 Cal.App.5th 1009, 1016–1017 (*Joanne R.*).)

A valid jury trial waiver in the LPS context is one that is knowing, intelligent and voluntary.[3] (*People v. Daniels* (2017) 3 Cal.5th 961, 990–991, 1002 (lead opn. of Cuéllar, J.) (*Daniels*); see *Joanne R., supra*, 72 Cal.App.5th at p. 1017 ["case law governing criminal proceedings provides guidance for LPS civil commitment proceedings"].) Thus, a trial court may not accept a jury waiver unless it is "knowing and intelligent, that is, ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it' " ' . . . ." (*People v. Collins* (2001) 26 Cal.4th 297, 305 (*Collins*).) Further, a trial court may not accept a jury trial waiver unless it is voluntary " ' " ' "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." ' " ' " (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 166 (*Sivongxxay*).)

---

[3] The parties agree case law addressing the validity of jury trial waivers in criminal proceedings applies in LPS civil commitment proceedings.

7

The validity of a jury trial waiver depends upon " 'the unique circumstances of each case.' " (*Sivongxxay, supra*, 3 Cal.5th at p. 166.) As such, in determining whether a defendant has provided a knowing, intelligent and voluntary waiver, we "examine the totality of the circumstances." (*Id.* at p. 167; see *Daniels, supra*, 3 Cal.5th at p. 992 (lead opn. of Cuéllar, J.).) "We uphold the validity of a jury waiver ' "if the record *affirmatively* shows that it is voluntary and intelligent under the totality of the circumstances." ' [Citation.]" (*Daniels, supra*, at p. 991 (lead opn. of Cuéllar, J.), italics added by *Daniels*.)

Here, we consider based on the totality of circumstances whether R.P.'s waiver of a jury trial was intelligent, knowing, and voluntary. No issue is raised as to her mental capacity to provide this waiver. The record is as follows.

On July 15, 2021, the trial court held a hearing by video, due to the COVID-19 pandemic, to consider R.P.'s conservatorship challenge. After introductions, R.P.'s counsel turned to the issue of her choice of a bench or jury trial:

"[COUNSEL]: . . . [¶] You had emailed the Court and spoke to Melanie [K.] saying you wanted to appeal your placement. So we can go forward today with Judge Quinn.

"Do you agree that we can go forward today, as you said, appeal your conservatorship? Do you want to go forward with Judge Quinn as the judge?

"[R.P.]: Yes, I would like to appear too.

"[COUNSEL]: Well, [R.P.], we can go forward today. You've been calling me recently asking to come to court because even though you've said you're happy at the placement, you want to contest it.

"So we're here today.  We're asking for a court hearing.  We're all here, so we can go forward today.

"Would you like to go forward today?

"[R.P.]:  Yes."  (Boldface omitted.)

After considering and denying R.P.'s motion under *People v. Marsden* (1970) 2 Cal.3d 118, the following colloquy occurred:

"THE COURT: . . . [¶] So, Ms. [R.P.], now we are back on the record.

"So we conducted the *Marsden* hearing, and I made a ruling, but I still want to talk to you a bit about today's proceeding.

"So, Ms. [R.P.], you have a right to a jury trial in connection with whether a conservatorship should be established.  So you can—or you can have a bench trial.  A bench trial would be me alone making the decision whether the conservatorship should be established.  A jury trial would mean a panel of 12 folks would come in.  You have an opportunity to participate in the selection of those folks, and then they would decide whether the conservatorship would be established and they would have to agree unanimously.

"You're familiar with the concept of a jury trial, right, Ms. [R.P.]?

"[R.P.]:  Yes.

"THE COURT:  So would you like to have a bench trial today in front of me or a jury trial at a later date?

"[R.P.]:  I'm not sure.

"[COUNSEL]:  Ms. [R.P.], just to remind you, you've communicated to me and communicated to the Court that you wanted a quick, prompt hearing to contest, as you call it, to appeal the conservatorship.  So we spoke to Dean [W.] (phonetic) yesterday.  So we can go forward today to contest the conservatorship.  If you win, you will be released today.

9

"So would you like to go forward today with Judge Quinn for a Court trial, or do you want to wait for a jury trial? I don't know when we would get to a jury trial. You indicated to me before that you wanted to go forward as soon as possible so we've added it this week.

"[R.P.]: Yes.

"[COUNSEL]: Can we go forward today, Ms. [R.P.]?

"[R.P.]: Yes.

"[COUNSEL]: Thank you, Ms. [R.P.].

"THE COURT: All right. So you're okay with a bench trial and you want to waive your right—what? I'm sorry.

"[R.P.]: I said I need time to think about it.

"THE COURT: Okay. So if you need time to think about, than [*sic*] it's not going to happen today. Just so you know. I'm not trying to say one way or the other, but everyone is here today now, and we can't hold everyone for very long.

"So you need time. Do you want like five minutes, or do you want days?

"[R.P.]: Um. Well, how—

"[COUNSEL]: Ms. [R.P.], just to remind you, you emailed the Court that you wanted a quick hearing, a prompt hearing. So we're here today to do a court trial. That is what I told you two days ago.

"Dr. Wyss will get to testify first. He'll give the Court the reasons why you should be conserved and your placement. After Dr. Wyss testifies, it will be your turn to talk to the judge.

"You asked to talk to the judge, so today is your opportunity to talk to the judge if you agree to do a court trial.

"Can we go forward with the court trial today, or do you want to come back another day?

10

"[R.P.]: We can go forward today.

"[COUNSEL]: Thank you, Ms. [R.P.].

"[R.P.]: Another day.

"[COUNSEL]: Ms. [R.P.], you just said two things. Can we go forward today, yes or no?

"[R.P.]: Yes. Yes.

"[COUNSEL]: Thank you, Ms. [R.P.].

"THE COURT: So you're waiving your right to a jury trial, Ms. [R.P.]. Do you understand that?

"[R.P.]: Yes.

"THE COURT: Okay. All right. Then we will proceed today.

"So just so you know, we're going to do the hearing just like, you know, where everyone is present in court just like a trial. So first, the Public Conservator will put on their evidence. They will have the doctor testify, I understand; then you and [counsel] will put on your evidence, which I understand will be you testifying.

"Then I'll rule, but it's important that throughout the proceeding, only one person speaks at a time and nobody interrupts each other. That's because we also have a court reporter who is writing everything down. She can only write everything down if one person speaks at a time. Okay?

"[R.P.]: Okay." (Boldface omitted.)

R.P. contends the trial court's advisement failed to meet the minimum requirements set forth in *Sivongxxay, supra*, 3 Cal.5th 151, for establishing that a waiver was knowing, intelligent and voluntary. Specifically, she faults the court for failing (1) to clarify that the jury of "12 folks" would be members of her community, (2) to ask her additional questions to ensure she

11

understood "the facets of the jury trial right," and (3) to ask whether she had any questions about waiving this right.

We reject R.P.'s arguments. As the California Supreme Court has repeatedly held, there is no "rigid rubric for trial courts to follow" in deciding whether to accept a jury trial waiver from a defendant. (*Daniels, supra*, 3 Cal.5th at pp. 992–993 (lead opn. of Cuéllar, J.).) Indeed, similar to here, in *Sivongxxay*, "the Supreme Court concluded the defendant's waiver of his right to a jury trial was knowing and intelligent where the trial court had advised him 'that he had a right to a jury trial, that a jury consists of 12 people from the community, that he would have the right to participate in the selection of the jury, and that waiver of the right to a jury would mean the judge alone would determine his guilt or innocence and any resulting punishment.' (*Sivongxxay, supra*, 3 Cal.5th at p. 167.) The court rejected the defendant's argument that the jury waiver was deficient because the trial court failed to advise him that the jury must be impartial and render a unanimous verdict, explaining, ' "[T]he United States Supreme Court has never held that a defendant, when waiving the right to a jury, constitutionally is entitled to be canvassed by the trial court, let alone to require a specifically formulated canvass" [citations], and we have never insisted that a jury waiver colloquy invariably must discuss juror impartiality, the unanimity requirement, or both for an ensuing waiver to be knowing and intelligent.' (*Id*. at p. 168, fn. omitted; [citations].)" (*Joanne R., supra*, 72 Cal.App.5th at p. 1018.)

Applying these standards, we find the trial court's advisement adequate. Not only did the court advise R.P. that a bench trial would entail the judge's deciding her challenge, but also the court explained that a "jury trial would mean a panel of 12 folks would come in," that she would

12

participate in selecting those "folks," and that that group would need to agree unanimously on whether to establish the conservatorship. Afterward, the court asked for confirmation from R.P. that she was "familiar with the concept of a jury trial . . . ." R.P. responded that she understood. Nothing more was required. (See *Joanne R., supra*, 72 Cal.App.5th at p. 1019 ["court's failure to advise that Joanne, through her counsel, had the right to participate in jury selection did not invalidate her jury waiver given the other advisements that informed [her] of 'the essence of the jury trial right' "]; *Sivongxxay, supra*, 3 Cal.5th at pp. 166–167.)

A more difficult question arises as to whether R.P.'s waiver was voluntary " ' " ' "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." ' " ' " (*Sivongxxay, supra*, 3 Cal.5th at p. 166.) R.P.'s counsel twice interjected when she equivocated as to whether she wanted a jury trial to "remind" her she had communicated to him and the court that she wanted a "quick, prompt hearing to contest . . . ." Counsel also advised R.P. that while a bench trial could proceed that day, he "[did not] know when we would get to a jury trial." And when R.P. asked for time to consider whether she wanted a jury trial, the court warned, "[I]f you need time to think about, than [*sic*] it's not going to happen today. Just so you know. I'm not trying to say one way or the other, but everyone is here today now, and we can't hold everyone for very long."

R.P. contends her counsel's conduct, while not "overt[ly] coerci[ve]," amounted to "an explicit pressure campaign . . . to have [her] waive jury trial." R.P. relies on *Collins, supra*, 26 Cal.4th 297. There, the California Supreme Court held the defendant's waiver was involuntary where the court advised the defendant that " 'there might well be a benefit' " to his waiver of

the right to a jury trial and that " '[j]ust by having waived jury, that has some effect on the court . . . [b]y not taking up two weeks' time to try the case.' " (*Id.* at p. 302, italics omitted.)  The court added, " 'I'm not specifying that there's any particular benefit, but that by waiving jury, you are getting some benefit, but I can't tell you what that is because I don't know yet.' " (*Ibid.*, italics omitted.)  According to the Supreme Court, the trial court's proposed benefit to the defendant for waiving his jury trial right "presented a 'substantial danger of unintentional coercion,' " in violation of his right to due process.  (*Id.* at p. 309.)

We find *Collins* distinguishable.  Here, the record does not demonstrate R.P. was promised an improper (and unidentified) benefit by court or counsel for forgoing her right to jury trial.  Instead, similar to the facts of *Joanne R.*, the court and counsel advised that were R.P. to agree to a bench trial, it would begin immediately.  Yet, if R.P. were to exercise her right to a jury trial, there would be some unknown delay before the court could proceed.[4] This realistic, if unfortunate, account of the consequences of her choice to proceed with a jury or bench trial was not improper.  (*Joanne R., supra*, 72 Cal.App.5th at p. 1020 [the trial court did not offer the proposed conservatee a "benefit" for proceeding with a court trial but "instead simply advis[ed] her of the reality of when she could have a court or jury trial"].)

We do not lightly dismiss R.P.'s concerns that counsel pressured her to waive a jury trial at a time when she was "unable to express her preference . . . ."  However, in the absence of an affirmative showing, we decline to presume counsel's conduct fell outside the wide range of

---

[4] Given that this hearing occurred in July 2021, in the midst of the COVID-19 pandemic, it is regrettable but understandable that her jury trial would be delayed.

14

professional standards of competence. (*John L., supra*, 48 Cal.4th at pp. 156–157 ["in the absence of any contrary indication, the superior court may assume that an attorney is competent and fully communicates with the proposed conservatee about the entire proceeding"]; *People v. Ngo* (1996) 14 Cal.4th 30, 36–37 [an attorney admitted to the California State Bar is presumptively competent].) As the California Supreme Court cautions, "although a court's observation of an individual might be useful in some circumstances, an attorney will generally have a more extensive opportunity to confer with her client about his rights and to weigh the client's behavior." (*John L., supra*, at p. 156.) Accordingly, we uphold the trial court's acceptance of R.P.'s waiver as knowing, intelligent and voluntary.

## III. Counsel's Failure to Object to Hearsay Testimony.

Next, R.P. contends her counsel rendered ineffective assistance by failing to raise hearsay objections to testimony from her treating psychiatrist (Dr. Wyss) that she: (1) had multiple previous contacts with the mental health system and multiple previous incidents of violence; (2) was jailed in 2020 on an assault charge; (3) frequently visited emergency departments and was in the top 5 percent of emergency department users citywide; (4) had a variable history of compliance with her psychiatric medications and generally declined medications when in the community; (5) was jailed just four days after her November 2020 release from custody; and (6) was homeless prior to her arrest, having lost housing at Bayanihan House for assaulting staff and residents. R.P. relies on the holding in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, that "[w]hen any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their

15

truth." Accordingly, "an expert *cannot* . . . relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Ibid.*) As we will explain, even if Dr. Wyss's testimony in one or more of these instances constituted improper hearsay, the failure of R.P.'s attorney to raise a *Sanchez* objection was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18.)

A proposed LPS conservatee has a statutory right to effective assistance of counsel. (*Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 710; § 5365.) However, ineffective assistance of counsel cannot be established on direct appeal unless " '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. . . .' [Citation.] [¶] . . . [¶] Finally, [appellant] must show it is reasonably probable that he would have achieved a more favorable result had counsel raised a *Sanchez* objection." (*People v. Bona* (2017) 15 Cal.App.5th 511, 517, 521–522 (*Bona*) [finding no ineffective assistance of counsel where there were possible tactical reasons for counsel's omissions, the expert testified as to his own personal observations of the proposed conservatee, and exclusion of the challenged hearsay evidence would not have precluded the expert from stating opinions based upon this evidence].) In other words, absent a showing of prejudice, an ineffective assistance claim fails. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

Thus, even if R.P.'s counsel improperly failed to object under *Sanchez*, we affirm the conservatorship order unless R.P. proves an objection would have led to a more favorable outcome. "On review, we apply the substantial evidence test to determine whether the record [without the challenged

16

evidence] supports a finding of grave disability. [Citation.] The testimony of a single witness is sufficient to support the trial court's finding. [Citations.]" (*Conservatorship of Johnson* (1991) 235 Cal.App.3d 693, 697 (*Johnson*).)

On this record, we find substantial evidence that R.P. was gravely disabled notwithstanding the expert testimony she labels as improper hearsay. In this context, "gravely disabled" means "the person, due to mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for his or her basic needs of food, clothing, or shelter." (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134, 135 (*Carol K.*) [grave disability standard is disjunctive, meaning evidence of inability to provide food, clothing *or* shelter suffices].) Dr. Wyss, R.P.'s treating psychiatrist for the month preceding the conservatorship hearing, testified that R.P. was paranoid, was disorganized with her thoughts, and had difficulty articulating her wants. Further, she "ha[d] very limited insight into her mental health" and denied having a mental illness. Given her lack of insight, R.P.'s psychiatrist was doubtful she would continue to take her medications if released. And, without medications or engagement with mental health services, the psychiatrist testified that R.P. would be prone to act upon her "paranoid ideation . . . ." While R.P. told the psychiatrist that she could access shelters if released, he opined based on her paranoia (among other factors) that a shelter would not be a "viable option" for her.

These opinions by Dr. Wyss alone constitute substantial evidence that R.P. was gravely disabled. (See *Johnson, supra*, 235 Cal.App.3d at p. 697.) However, there is more, as R.P.'s own testimony corroborated her psychiatrist's opinions. First, R.P. stated that she had anxiety, not schizophrenia. In addition, when asked whether she would return to "Baker

17

Place" if released, R.P. appeared confused, replying, "Yes—no." And when her counsel asked where she had signed up for housing, R.P. responded, "The hotel, I mean the Ritz." The court was entitled to rely on this testimony as further evidence R.P. was unable to provide for her basic need for shelter. (*Carol K., supra*, 188 Cal.App.4th at pp. 134, 135.)

Finally, even if R.P. is correct that the psychiatrist's opinions were based in part on inadmissible hearsay evidence that her attorney should have objected to, the "exclusion of the challenged evidence would not have precluded [the psychiatrist] from stating the opinions upon which that evidence was based. As *Sanchez* makes clear, '[a]ny expert may still *rely* on hearsay in forming an opinion, and may tell the [trier of fact] *in general terms* that he did so.' [Citation.]" (*Bona, supra*, 15 Cal.App.5th at p. 522, 1st bracketed insertion added [finding no prejudice in counsel's omission of *Sanchez* objections because there would not have been a more favorable result].) Accordingly, R.P.'s claim of ineffective assistance fails. (See *Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 54 ["Evidence conservatees (1) lack insight about their mental illness, (2) would not take medication without the support of a conservator, and (3) could not provide for themselves without medication is enough to support a court's finding of grave mental illness"]; cf. *People v. Yates* (2018) 25 Cal.App.5th 474, 488 [finding ineffective assistance of counsel where counsel was familiar with *Sanchez*, there was no conceivable reason for counsel's failure to object under *Sanchez*, and but for counsel's failure, a different result would have occurred given the "volumes" of hearsay expert testimony that came in].)[5]

---

[5] This holding defeats R.P.'s stand-alone, but related, challenge to the sufficiency of the evidence supporting the court's finding that she was presently gravely disabled.

18

**IV.    Ban on Possession of Firearms and Deadly Weapons.**

R.P.'s remaining claim is that the trial court's written order banning her from possessing firearms or deadly weapons is not supported by substantial evidence.  According to R.P., this issue was never raised at the hearing and the order itself was not made on the record.  We reject her arguments.

A conservatorship may result in the loss of certain personal rights, including the right to possess a firearm, pursuant to section 8103, subdivision (e).  (§ 5357.)  To limit this right, the court must find "possession of a firearm or any other deadly weapon by the person would present a danger to the safety of the person or to others.  Upon placing a person under conservatorship, and prohibiting firearm or any other deadly weapon possession by the person, the court shall notify the person of this prohibition." (§ 8103, subd. (e)(1).)  The court need not make "a specific, on-the-record statement of the reasons for [such] order . . . .  [Moreover], we follow the usual rules on appeal [citation] and 'presume in favor of the judgment every finding of fact necessary to support it warranted by the evidence' [citation]." (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165.)

Here, this standard was met.  While the court did not make an on-the-record statement regarding the order banning R.P. from possessing a firearm or other deadly weapon, the evidence in the record, viewed favorably to the court's ruling, supports it.  The affidavit from Dr. Roth that accompanied the conservatorship petition detailed numerous incidents of violence committed by R.P., including stabbing a family member and chasing her brother with a knife.  In addition, Dr. Wyss testified at the hearing that R.P. was diagnosed with schizophrenia and exhibited paranoia and disorganized thinking, which he described as "thought blocking."  Dr. Wyss further opined that, without

19

her medications, R.P. would be prone to act upon her "paranoid ideation . . . ." This record constitutes substantial evidence that R.P.'s possession of a firearm or other deadly weapon "would present a danger to the safety of the person or to others." (§ 8103, subd. (e)(1).)

## DISPOSITION

The trial court's conservatorship order of July 15, 2021, is affirmed.

_____
Jackson, P. J.

WE CONCUR:

_____
Simons, J.

_____
Burns, J.

A163431/*S.F. Public Guardian v. R.P.*