Filed 8/18/22  Conservatorship of J.D. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| Conservatorship of the Person of J.D. | |
| TULARE COUNTY PUBLIC GUARDIAN, | F083415 |
| Plaintiff and Respondent, | (Super. Ct. No. VPR048411) |
| v. | |
| J.D., | **OPINION** |
| Objector and Appellant. | |

### THE COURT[*]

APPEAL from an order of the Superior Court of Tulare County.  Nathan D. Ide, Judge.

Linda J. Zachritz, under appointment by the Court of Appeal, for Objector and Appellant.

Jennifer M. Flores, County Counsel, John A. Rozum, Chief Deputy County Counsel, and Jason Chu, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Hill, P. J., Poochigian, J. and Snauffer, J.

In conservatorship proceedings under the Lanterman-Petris-Short Act (the LPS Act) (Welf. & Inst. Code, § 5000 et seq.),[1] the trial court found appellant, J.D., to be "gravely disabled" due to a mental disorder, whereupon the court granted the petition to continue appellant's conservatorship and reappoint respondent Tulare County Public Guardian (respondent or county) as the conservator of appellant's person. J.D. argues that (1) the trial court's finding that he was gravely disabled was not supported by substantial evidence, and (2) the trial court erred in authorizing the county to consent to psychiatric treatment, including administration of medication, because substantial evidence did not support the finding that he lacked the capacity to give informed consent. The county disagrees on both accounts. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

J.D. is a 49-year-old male who has been on successive LPS Act conservatorships, on a temporary basis starting on June 13, 2017, and continuing on a permanent basis from July 11, 2017. The permanent conservatorship has been reviewed and continued by the trial court every six months since July 11, 2017. Each order continuing J.D.'s conservatorship has included imposition of disabilities,[2] including a suspension of his right to refuse antipsychotic, neuroleptic, and/or psychotropic medication. Most recently, on July 2, 2021, the county petitioned for continuation of J.D.'s conservatorship and reappointment as conservator, alleging that J.D. was gravely disabled (§ 5008) and lacked the capacity to give informed consent to treatment of his grave disability, including through the use of antipsychotic, neuroleptic, and/or psychotropic medication.

---

[1]     All statutory references are to the Welfare and Institutions Code.

[2]     The LPS Act allows a trial court to impose "disabilities" upon a conservatee—i.e., temporary suspensions of or limitations on a conservatee's statutorily identified rights—as needed (§ 5357). For example, section 5357, subdivision (d), identifies "[t]he right to refuse or consent to treatment related specifically to the conservatee's being gravely disabled" as one of the rights that may be suspended in imposing a disability. The power to exercise that right may then be granted to the conservator. (§ 5357.)

As part of the six-month review process, and in anticipation of the July 2, 2021 petition, the county filed declarations of J.D.'s case manager, conservatorship investigator, and two reviewing doctors, recommending reappointment of the conservator. The case manager and conservatorship investigator filed a declaration, opining that J.D. was gravely disabled "[a]s a result of a … mental disorder … and is[] [¶] [u]nable to provide for his … basic personal needs …; and is [¶] [u]nwilling … of accepting treatment voluntarily; and is [¶] [i]ncapable of consenting to receiving antipsychotic medications …." The declaration further detailed that J.D. was previously diagnosed with schizoaffective disorder, bipolar type; cannabis abuse; other stimulant dependence; and anxiety disorder. It alleged J.D. exhibited a "[g]ross denial of illness," "[p]oor judgement," "[p]reoccupation," and "[r]espond[ed] to auditory hallucinations." It alleged further that J.D. "[l]ack[ed] capacity to consent to administration of antipsychotic … medications," previously refused outpatient treatment, could not cook for himself, had no realistic plan for obtaining meals, clothing, or shelter, had been evicted from a prior residence due to inappropriate behavior, and "[s]plurge[d] on items leaving nothing for food or rent." The declaration concluded that the least restrictive level of care required to treat J.D.'s condition was a community care facility empowered to consent to administration of antipsychotic, neuroleptic, and/or psychotropic medications on his behalf.

Two medical doctors filed declarations concurring in the medical diagnoses set out in the case manager and conservatorship investigator's declaration with one doctor noting that J.D.'s cannabis dependence and stimulant dependence were both in remission. Both doctors further opined that J.D. was gravely disabled as a result of a mental disorder and was incapable of accepting treatment voluntarily, consenting to receiving antipsychotic medications, or providing for his basic needs.

On July 20, 2021, the trial court held an initial hearing on the reappointment petition. J.D.'s public defender requested a contested hearing on the petition. The

3.

contested hearing was set for September 14, 2021, and the conservatorship, the county's guardianship, and the previously imposed disabilities were continued until that date.

On September 14, 2021, the trial court held the contested hearing on the conservatorship petition. The parties stipulated that the court could consider a redacted psychodiagnostic report prepared by Elaine Guerrero Clar, Psy.D., dated August 16, 2021. The report outlined J.D.'s disorders and conditions: schizoaffective disorder, bipolar type, cannabis dependence, stimulant dependence, and anxiety disorder. The redacted report explained that Clar relied upon J.D.'s psychosocial history, hospitalization records, prior conservatorship investigation, and notes from J.D.'s board and care facility. The summary of those records was the only portion of the report to be redacted. The report detailed Clar's mental status examination of J.D. J.D. was advised of the nature and purpose of the interview, and he acknowledged his understanding and gave his assent to the interview.

J.D.'s posture was appropriate, his hygiene was adequate, his attire was appropriate for the weather, and he was cooperative in nature. "He presented as confused at times, as he provided responses that were out of context to past, present, and future." J.D. appeared to have difficulty understating questions and Clar "repeated … and re[]worded various inquiries on multiple occasions …" for his benefit. He did not always respond to inquiries without prompting and his responses were occasionally nonresponsive. For instance, when asked how he would get transportation, he responded, " 'yeah.' " Clar described his thought process as "circumstantial, for instance, he was able to name various foods he could make, and how much income he believed he had, however, [he] was unable to describe steps to obtaining food nor money for finances."

J.D. "demonstrated anxious behavior," reported his mood as anxious, and stated that the previous day his anxiety was ranked a "7 out of 10, with 10 being the highest level of anxiety." He denied auditory hallucinations but "reported having ongoing paranoia regarding someone wanting to strike him daily, due to a past assault. While he

demonstrated fair insight into his mental illness, he evidenced poor judgment as seen in his lack of thoughtfulness into a future viable plan of self-care."

With regard to compliance with treatment, Clar reported that J.D.

"was knowledgeable in the various psychotropic medications he is administered. He demonstrated understanding the purpose of the medication[s] and how they affect him. However, he was uncertain as to how to obtain the medications that are currently prescribed to him if LPS [c]onservatorship were to be terminated. He reported that he could go to the Veteran's Affairs but was uncertain how to obtain transportation to the office. In addition, he was unsure how to obtain a pharmacy in order to refill medications. When discussing mental health treatment and therapeutic intervention, he was often quiet and did not participate in feedback regarding a future plan to comply with treatment. At one point, he was asked what a plan may be in order to take his medications as prescribed. He stated, he would ask his father to call him, however, he also mentioned that his father's phone number is blocked, and he sometimes does not accept [J.D.]'s calls. Should [J.D.]'s LPS [c]onservatorship be terminated, it is unlikely that [he] would be successful in complying with treatment."

Clar further opined that J.D. was unable to articulate a viable plan for self-care. J.D. told Clar that he wanted to live at "an apartment, a men's shelter, [his] family home, or [a] friend's home and become his own payee." However, J.D. was "uncertain as to steps in locating an apartment, nor was he able to identify a city he would like to live in. When he was asked how he would be transported, he was uncertain." Clar further expressed doubt that J.D. could manage his own finances and related a report from the team leader of the board and care facility where J.D. lived: "there was a recent situation, where [J.D.] had requested funding from his public guardian for a mobile phone. It was later learned that he spent these designated funds on miscellaneous items, rather than the intended expense." For those reasons, Clar opined that J.D. was "not capable of living independently due to his impaired functioning, poor judgment, and lack of a viable plan for self-care."

Clar summarized her findings and opinions regarding J.D.'s history and needs: J.D. was originally placed on an LPS conservatorship as a "result of nonadherence to psychotropic medications and subsequent[]ongoing psychotic symptoms to the point of aggression, paranoia[,] and suicidal intent. … [M]ost recently [he] ha[d] been very compliant with treatment." The board and care facility was then working on an application to transfer him to a facility that offered increased independence while maintaining his psychiatric needs. Despite his progress, J.D. required the structure of an LPS conservatorship to care for his basic needs because he displayed "no insight into his mental illness or need for mental health treatment … [and] he was unable to provide a viable plan of self-care if released from his LPS [c]onservatorship." Clar opined that J.D. appeared to be mentally ill and gravely disabled and is impaired in autonomous judgment and capacity. She recommended that J.D.'s conservatorship be continued, that he be committed to a community care facility, and that the conservator be granted the power to consent to treatment on his behalf, to include administration of antipsychotic, neuroleptic, and/or psychotropic medications.

J.D. testified at the contested hearing.[3] He had been living at a board and care facility for approximately one- and one-half years. At the facility, J.D. was permitted to come and go as long as he returned by 7:00 p.m. every night. He had never violated the curfew. If no longer subject to a conservatorship, J.D. would choose to live with his parents or "stay in a motel until [he could] get [his] own place." He had not spoken to his

---

[3] Repeatedly during J.D.'s testimony, his responses appear to reflect that he had trouble understanding the question. For instance, when asked where he resided, if he was taking medication for mental illness, how long he had been in compliance with his medication, whether he had a mental illness, whether he had been hospitalized since his conservatorship began, and more, J.D. answered "I'm sorry?" or "I'm sorry, what?" before answering the question. County counsel commented on the issue: "One concern, however, and it may not be captured by the reporter's transcript, is the hesitancy in—I interpret confusion, demonstrated by [J.D.] to answer simple questions asked by, both, counsel and myself."

parents about living with them and had never lived in a hotel before. To find a place to live more permanently, J.D. would get a "newspaper and look[] for an address for a realtor [to] see what they had." J.D. understood that he would have to pay for housing. He planned to spend about $1,000 per month of his $3,100 veteran's disability check on housing. J.D. had lived on his own for a couple years in the past and knew how to create a budget. He anticipated spending $200 per month on food and $200 per month on clothing. He knew that he could buy groceries at a supermarket and clothing at a department store. J.D. had previously grocery shopped and cooked for himself. He could cook pancakes, hot dogs, and hamburgers for himself. He understood that he needed to eat three meals per day.

J.D. had not contacted the Department of Veterans Affairs since being subject to the conservatorship. However, he knew that he had been to the Fresno office once before and planned to go there using public transportation. J.D. did not currently have a bus pass but he understood that he could obtain a bus pass through the county's mental health office.

J.D. understood that he had a mental illness, specifically "bipolar schizoaffective" disorder. J.D. could recognize when his symptoms began to become overwhelming. He would get "kind of worked up." But that symptom had not occurred frequently in the last year because he was taking the "good meds."

J.D. took medication for his mental illness. He took that medication twice per day, at 8:00 a.m. and 5:00 p.m. He had been voluntarily taking his medication for "a long time" and would continue to do so if no longer subject to a conservatorship. Prior to his conservatorship, J.D. was hospitalized "quite a few times." Since he began his conservatorship, he had not been hospitalized pursuant to section 5150. If no longer subject to a conservatorship, he would take steps to keep himself stable. He would go to the county's mental health office and talk to a psychiatrist to obtain a prescription for medication and fill the prescription at a supermarket that contained a pharmacy. He had

7.

gone to a supermarket to fill a prescription once before. He did not presently have an account at a pharmacy, but he expressed that "hopefully, [he was] going to get it going." J.D. planned to walk or take the bus to the supermarket to obtain his medication.

J.D. explained that he wanted to no longer be subject to the conservatorship because it had been ongoing for four years, he had done a good job at the board and care facility, and he was ready to move on. He explained that he originally accepted the conservatorship because he had been living on the street for 10 months.

On that record, the trial court found that "[e]vidence beyond a reasonable doubt establishe[d] that [J.D. was] gravely disabled as a result of a mental disorder. [¶] And "[c]lear and convincing evidence establishe[d] that [J.D. did] not have the capacity to give informed consent to treatment specifically related to his grave disability …." The trial court explained that J.D. had a mental disability that resulted in him being unable to take care of himself outside of a structured environment. The court was "not convinced that [J.D.] ha[d] a viable plan for self-care [and therefore concluded] [t]hat [J.D.] remain[ed] in need of … conservatorship" and that the care plan then in place was the least restrictive sufficient to meet his mental health needs. The court therefore extended J.D.'s conservatorship for one year and approved the individual treatment plan filed on May 28, 2021. The trial court's written order further reappointed the county as conservator and granted the county the power to require J.D. to "[r]eceive treatment related specifically to remedying or preventing the recurrence of [J.D.'s] being gravely disabled, including antipsychotic/neuroleptic/psychotropic medication." The trial court suspended J.D.'s right to refuse treatment for the same.

## DISCUSSION

J.D. contends that substantial evidence does not support the trial court's conclusions that he was gravely disabled and that he lacked the capacity to give informed consent to treatment of his mental health disorder with psychotropic medication. The county disagrees, as do we.

## I.  Gravely Disabled

Under the LPS Act, "[w]hen a treatment professional determines a person is gravely disabled and unwilling or unable to accept treatment voluntarily, the county's public guardian may petition to establish a conservatorship." (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1095, citing § 5352.)  A person is considered " 'gravely disabled' " when he or she, "as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A);[4] see *Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134, 135 [grave disability standard is disjunctive, meaning evidence of inability to provide food, clothing, *or* shelter suffices].)  If the trial court concludes beyond a reasonable doubt that a person is gravely disabled, it appoints a conservator to provide individualized treatment, supervision, and placement (§§ 5350, 5350.1), imposes "disabilities" as needed (§ 5357), and determines the "least restrictive alternative placement …" (§ 5358, subd. (a)(1)(A)). (See *Eric B.*, at pp. 1095–1096.)

An LPS conservatorship of a gravely disabled person automatically expires after one year.  (§ 5361.)  Thereafter, the conservator may petition to reestablish the conservatorship for additional one-year periods.  (*Ibid.*)  The focus of an LPS conservatorship reappointment is "on a conservatee's current needs and condition." (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 543; accord, § 5361 [to reappoint a conservator, "two physicians or licensed psychologists" must opine "that the conservatee is *still* gravely disabled as a result of [a] mental disorder"], italics added.)

On review, "we apply the substantial evidence standard to determine whether the record supports a finding of grave disability.  The testimony of a single witness may be sufficient to support such a finding.  [Citation.]  We review the record as a whole in the

---

[4]    An alternate method of proving a person is gravely disabled is provided by statute. (§ 5008, subd. (h)(1)(B).)  It is not at issue in this case.

light most favorable to the trial court judgment to determine whether it discloses substantial evidence. Substantial evidence, which is evidence that is reasonable, credible, and of solid value, also includes circumstantial evidence." (*Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134.) In reviewing the record for substantial evidence, we presume the existence of every fact that the trier of fact could have reasonably deduced from the evidence. (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) But we do not resolve conflicts in the evidence or reweigh the evidence, nor do we reevaluate the credibility of witnesses, as "those functions are reserved for the trier of fact." (*People v. Riley* (2015) 240 Cal.App.4th 1152, 1163.)

As a preliminary matter, J.D. admitted below that he suffers from a mental disorder. He does not contest that portion of the trial court's finding. Instead, he argues that Clar's report is "flawed to the extent it cannot be considered credible" regarding J.D.'s ability to provide for his basic needs. Specifically, J.D. first contrasts the portion of Clar's report that indicates J.D. demonstrated "fair insight into his mental illness" with her later conclusion in the same report that "[h]e display[ed] no insight into his mental illness or need for mental health treatment." Second, he argues that Clar's conclusion that J.D.'s " 'prognosis for improvement remains poor' " was inconsistent with her finding that J.D. had "fair insight into his mental illness" and was knowledgeable about his medications and their purposes and effects. Third and finally, J.D. argues that Clar's opinions that J.D. was unable to provide food, shelter, and clothing for himself were at odds with J.D.'s presentation in the courtroom such that Clar's report was not credible and could not constitute substantial evidence.

The county responds that acceptance of J.D.'s argument would require us to do that which we are not permitted to do, reweigh the evidence and substitute our own judgment for that of the trial court.

Again, our role is to determine whether the trial court's conclusions were supported by substantial evidence—we determine whether, in the light most favorable to

10.

the court's decision, the evidence in support of the decision was capable of being credited, if so, we affirm even if a rational trier of fact could have reached a different decision. Here, even though Clar's report contained some inconsistency regarding J.D.'s level of insight into his mental illness, it was not so flawed as to be entirely unworthy of credit. Clar described J.D.'s ongoing paranoia, compromised judgment in financial matters, and inability to prepare a viable plan for self-care, including specific details regarding how he would obtain food or medication or how he planned to comply with future treatment needs. Beyond that which J.D. told Clar regarding his self-care plan upon release, his testimony regarding his self-care plan included his planned transportation method, but provided little additional detail. The trial court agreed, stating that "while [J.D.] was able to describe a general budget and what things would cost, … all of his answers were fairly vague." The trial court acknowledged J.D.'s apparent increased capacity to respond to questions since the interview, but also noted J.D.'s symptoms in the past year and echoed Clar's concern that J.D. would be "unable to actually follow through and take care of himself … outside of a structured environment." Accordingly, the court was "not convinced that [J.D.] ha[d] a viable plan for self-care."

The trial court found Clar's report to be reliable and credible. J.D.'s arguments provide no basis to disturb that finding. (See *Conservatorship of S.A.* (2020) 57 Cal.App.5th 48, 55 (*S.A.*).) The trial court's conclusion that J.D. was gravely disabled was supported by substantial evidence.

## II.  Powers and Disability Regarding Consent Psychiatric Treatment

The trial court found by "[c]lear and convincing evidence … that [J.D. did] not have the capacity to give informed consent to treatment specifically related to his grave disability …." It therefore granted the county "the power to require [J.D.] to … [¶] … [r]eceive treatment related specifically to remedying or preventing … recurrence of [his] being gravely disabled, including antipsychotic/neuroleptic/psychotropic medication" and imposed a disability on J.D., suspending his right to refuse the same. J.D. contends this

11.

order was not supported by substantial evidence "and … was not even recommended by the" county's evidence. We disagree.

"A competent adult has the right to refuse medical treatment, including the right to refuse psychotropic drugs. [Citation.] A court's determination that a conservatee is gravely disabled does not, by itself, justify imposing an order allowing involuntary medication. [Citations.] [An LPS c]onservator[] may seek added authority over [a] conservatee[], including a limitation on the conservatee's right to refuse medical treatment. The [LPS Act] refers to medication authority as imposing a 'disabilit[y]' on the conservatee. (§ 5357, subd. (d).)" (*S.A.*, *supra*, 57 Cal.App.5th at p. 55.) In order for a trial court to impose a disability, suspending a gravely disabled conservatee's right to refuse psychiatric treatment, the conservator must prove by clear and convincing evidence that the conservatee is incompetent to give or withhold informed consent. (*Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1322–1323; *S.A.*, at pp. 55–56.) The factors to be considered in determining a conservatee's mental capacity to give or withhold consent include "whether the conservatee lacks mental capacity rationally to understand the nature of the medical problem, the proposed treatment, and its attendant risks." (*S.A.*, at p. 56.)

On review of an order imposing an involuntary psychiatric treatment disability, we "must determine whether the record contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this clear and convincing standard of proof. [Citation.] We do not reweigh evidence. [Citation.] We presume in favor of the judgment the findings of fact necessary to support it." (*S.A.*, *supra*, 57 Cal.App.5th at p. 56.) "There is no statutory requirement the court make an express finding of decisional incapacity. [Citation.] If sufficient evidence supports the need for involuntary medication, the lack of express reasoning on the record is not enough to support reversal." (*Id*. at p. 57.)

12.

First, regarding J.D.'s capacity to understand the nature of his mental health condition, the trial court had before it Clar's report and J.D.'s testimony. As we noted above, Clar's report somewhat inconsistently described that J.D. had "fair insight into his mental illness," in one section of the report, but had "no insight into his mental illness or need for mental health treatment" in another section of the report. Beyond those characterizations of J.D.'s level of insight, the report described J.D.'s behavior and Clar's observations and conclusions. For instance, it described that J.D. "presented as confused at times, as he provided responses that were out of context to past, present, and future"; required repetition and rewording of questions to understand; "demonstrated anxious behavior"; was at times not responsive to inquiries, in one instance responding, "yeah," to a question that did not seek a yes or no answer; appeared unable to concentrate on inquiries; reported having ongoing paranoia; and was "often quiet and did not participate in feedback regarding a future plan to comply with treatment." Clar opined that J.D.'s "autonomous judgment and capacity [we]re … impaired." J.D.'s testimony demonstrated similar limitations, such as repeatedly answering questions with, "I'm sorry, what?" (or variations on that response) before giving a substantive answer. The trial court was in the best position to assess J.D.'s testimony and any limitations apparent from his responses. While the record contains evidence from which the trial court could perhaps have found that J.D. understood the nature of his conditions, the record before us contains sufficient evidence to support the trial court's implied finding that there was a high probability J.D. lacked the capacity to understand his mental illness.

Second and third, as to whether J.D. understood the nature of the proposed treatment and the attendant risks, again the trial court had before it Clar's report which stated that J.D. "was knowledgeable in the various psychotropic medications he [was] administered[ and] demonstrated understanding the purpose of the medication[s] and how they affect him[,]" but also opined that J.D. was "incapab[le of] provid[ing] adequate informed consent to receive antipsychotic medication(s)," in the section of her report on

13.

"current indices of grave disability" and his "disabilities are such that capacity for informed consent and voluntary participation in treatment are significantly limited" in the section of her report entitled "recommendations." (Capitalization modified.) Also relevant to J.D.'s capacity to understand the nature and risks of his treatment, Clar's report opined that J.D.'s autonomous judgment and capacity are impaired; when Clar asked of J.D.'s plan for self-care upon release, J.D. "was often quiet and did not participate in [discussion] regarding a … plan to comply with treatment"; and "[h]e presented as confused at times, as he provided responses that were out of context to past, present, and future." Further, J.D. testified regarding his medications and symptoms. With regard to his medications, he referred to taking "good meds" and that they reduced his symptoms, and the times each day that he took medication. With regard to his symptoms, J.D. described only that he "get[s] kind of worked up." That understanding of his symptoms stands in contrast to Clar's description of J.D.'s symptoms at the time of the interview—paranoia and anxiety; previously, when unmedicated, "psychotic symptoms to the point of aggression, paranoia[,] and suicidal intent." In light of the evidence before the trial court and the court's comment on the vagueness of J.D.'s answers at the hearing, sufficient evidence was contained in the record to support the court's implied findings that a high probability existed J.D. did not have the capacity to understand the nature of the proposed treatments and the attendant risks. The fact that the record contains some evidence inconsistent with those conclusions does not compel a contrary outcome.

In short, while the record contains some conflicting evidence, clear and convincing evidence supported the trial court's finding that J.D. did not have the capacity to give informed consent to treatment of his grave disability. We find no error.

## DISPOSITION

The order is affirmed. All parties to bear their own costs.